UNITED STATES, Appellee

v.

Michael C. DIPAOLA, Culinary Specialist Third Class
U.S. Navy, Appellant

No. 08-0200

Crim. App. No. 200602442

United States Court of Appeals for the Armed Forces

Argued October 28, 2008

Decided December 18, 2008

ERDMANN, J., delivered the opinion of the court, in which
EFFRON, C.J., and BAKER and RYAN, JJ., joined.  STUCKY, J.,
filed a separate dissenting opinion.

Counsel


For Appellant:  Captain S. Babu Kaza, USMC (argued).

For Appellee:  Major Elizabeth A. Harvey, USMC (argued);
Commander Paul C. Leblanc, JAGC, USN (on brief); Lieutenant
Derek D. Butler, JAGC, USN.

Military Judge:  J. D. Bauer, P. H. McConnell, B. N. Roberts,
and E. G. Smith


**This opinion is subject to revision before final publication**.

United States v. DiPaola, No. 08-0200/NA

Judge ERDMANN delivered the opinion of the court.

A panel of officer and enlisted members found Culinary Specialist Petty Officer Third Class Michael C. DiPaola guilty of one specification of making a false official statement and two specifications of indecent assault in violation of Articles 107 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907 and 934 (2000).[1]

If the record contains "some evidence" of the affirmative defense of mistake of fact "to which the military jury may attach credit if it so desires," the military judge is required to instruct the panel on that affirmative defense. United States v. Hibbard, 58 M.J. 71, 72 (C.A.A.F. 2003) (citation and quotation marks omitted). We granted DiPaola's petition to determine whether the military judge erred in not instructing the panel on the mistake-of-fact defense for one of the indecent assault specifications.[2] We hold that the record contained "some evidence" of mistake of fact, that the military judge therefore erred in failing to give a mistake-of-fact instruction on this

[1] DiPaola was charged with one specification of false official statement in violation of Article 107, UCMJ, two specifications of indecent assault and two specifications of indecent exposure all in violation of Article 134, UCMJ. He was acquitted of the two indecent exposure specifications.

[2] Specification 2 of Charge II charged that DiPaola "commit[ted] an indecent assault upon [ED], U.S. Navy, a person not his wife, by holding her down on her bed by her wrists, kissing her, fondling and biting her breasts, sitting and laying on top of her, touching her vaginal area with his hand, attempting to

specification, and that the error was not harmless beyond a reasonable doubt.

## Background

DiPaola and Petty Officer ED met in the late winter of 2004, when they lived in the same barracks. Initially their relationship involved hanging out in each other's rooms and watching movies. At some point, the relationship became sexual and continued in that vein for several months. The relationship ended because ED "just didn't want to pursue it any further," and the pair "just quit talking to each other." [3]

In August 2004, when DiPaola returned from a deployment, he went to see ED in her barracks room. ED was "under the weather" and feeling "real sick." DiPaola told her he had missed her while he was away and wanted to go out with her. ED did not respond other than to tell him that she was not feeling well. As she laid down on her bed, DiPaola laid down behind her; they cuddled and fell asleep.

Three days later when ED returned to her barrack's room, DiPaola was waiting for her. She let him into her room, and DiPaola told her that he wanted to have sex with her. ED responded that she did not want to have sex. DiPaola kept

---

remove her underwear, and rubbing his erect penis against her vaginal area, with intent to gratify his sexual desires."

[3] As DiPaola exercised his right not to testify, all of the testimonial evidence as to the incident in question came from ED.

saying that he wanted to have sex and ED kept saying "no," but they then began consensually kissing and "making out" and eventually moved to her bed. ED stated she kissed him because she "still had feelings for him." Once on the bed, ED testified that she got on top of DiPaola and allowed him to remove her shirt and they continued kissing and making out. At some point during their encounter, DiPaola kissed her breasts and then started biting at her breasts. When she told him not to bite her breasts, he stopped.

DiPaola switched positions so that he was on top of ED. He grabbed her wrists and held them down on the bed above her head. DiPaola then attempted to unzip her pants, but ED managed to get one hand loose and pulled up her zipper. DiPaola continued to say "Let's have sex" and ED "just kept saying, 'No,' and he wouldn't listen." DiPaola tried begging ED for sex, which did not amuse her, but when he began offering her such things as marriage, children and his car, she found it amusing. They were both laughing during this exchange.

DiPaola rubbed ED's "crotch area" with his hand on top of her pants and he put her legs on his shoulders and "acted like he was having sex with [her]." This position hurt ED's wrists and legs and she pushed and kneed him. When DiPaola left the bed, he removed his penis from his pants and began stroking it with his hand. ED told him to stop but DiPaola continued and

asked her several times for oral sex.  ED told him "no" and told him she would "bite it off and spit it at him" if he came any closer.  According to ED, DiPaola laughed as he thought she was joking.  A few minutes later DiPaola stopped and said "he couldn't believe that it took so long, about an hour and a half, for [ED] to keep saying no, and [for him to] finally giv[e] up."  DiPaola then left ED's room.

In a sworn statement to Naval Criminal Investigative Service that was admitted into evidence, DiPaola acknowledged that he asked ED to have sex with him, but she said, "No."  He then "decided to try and convince her to have sex with [him]" until he understood that she was not going to change her mind and have sexual intercourse with him.[4]

## Discussion

A military judge is required to instruct the panel on affirmative defenses, such as mistake of fact, "if 'the record contains some evidence to which the military jury may attach credit if it so desires.'"  Hibbard, 58 M.J. at 72 (quoting United States v. Brown, 43 M.J. 187, 189 (C.A.A.F. 1995)).  When the defense has been raised by "some evidence," the military judge has a sua sponte duty to give the instruction.  Brown, 43 M.J. at 189 (citing Rule for Courts-Martial (R.C.M.) 920(e)(3)).

---

[4] It appears clear from the context of DiPaola's statement, that when he uses the term "sex" he is referring to "intercourse" as opposed to the conduct charged in the specification.

United States v. DiPaola, No. 08-0200/NA

An accused is not required to testify in order to establish a mistake-of-fact defense.  United States v. Jones, 49 M.J. 85, 91 (C.A.A.F. 1998).  The evidence to support a mistake-of-fact instruction can come from evidence presented by the defense, the prosecution or the court-martial.  Id. (citing R.C.M. 916(b) Discussion).  In addition:

> [t]he defense theory at trial and the nature of the evidence presented by the defense are factors that may be considered in determining whether the accused is entitled to a mistake of fact instruction . . . . "Any doubt whether an instruction 'should be given should be resolved in favor of the accused.'"

Hibbard, 58 M.J. at 73 (quoting Brown, 43 M.J. at 189) (citations omitted).

While an indecent assault offense[5] includes a specific intent element as to whether the touching was committed to satisfy the lust or sexual desires of the accused, the lack of consent element of the offense is a general intent element. United States v. Peterson, 47 M.J. 231, 234 (C.A.A.F. 1997). "Accordingly, a mistake-of-fact defense on this element would require both a subjective belief of consent and a belief that was reasonable under all circumstances."  Id. at 234-35.

DiPaola argues that there was "some evidence" before the panel that he honestly and reasonably believed ED consented to

---

[5] DiPaola was charged with indecent assaults while that offense was still listed under Article 134, UCMJ.  See generally Manual for Courts-Martial, United States pt. IV, para. 63 (2005 ed.).

some of his actions.  In support of this argument he notes: their prior consensual sexual relationship; ED's consent to the removal of her shirt and the kissing of her breasts after saying "no" to intercourse; their mutual kissing and making out; their laughter as to his offers of marriage, children and his car; and his compliance when she told him to stop biting her breasts. This evidence is put in context by the defense counsel's request for a mistake-of-fact instruction and the mistake-of-fact themes raised in opening and closing statements.

The Government responds that the dispute at trial did not concern mistake of fact as to consent but focused on whether there was consent.  It contends that because no evidence of a mistake of fact as to consent was presented by either party, the military judge was correct in not providing the instruction, citing United States v. Willis, 41 M.J. 435 (C.A.A.F. 1995).

In Willis, we found that the dispute at trial was limited to actual consent and stated "that a mistake-of-fact instruction is not warranted where the evidence raises and the parties dispute only the question of actual consent."  Id. at 438.  In this case the facts present no such clear dichotomy.  While it is well established that ED said "no" to sexual intercourse on this day and also asked DiPaola to stop biting her breasts, it is also clear that ED consented to and willingly participated in some of the sexual acts listed in the specification, such as

7

kissing DiPaola and allowing him to take off her shirt and kiss her breasts. These consensual acts could be seen, in conjunction with their past sexual relationship, as creating a "mixed message" as to which acts were permissible and which were off-limits.

Nor did the theory of the defense case focus solely on unambiguous consent as it did in Willis. While the Government argues that DiPaola's defense counsel presented the members with a "he said/she said" case, that argument ignores the approach taken by DiPaola's defense counsel in his opening and closing statements.[6] In his opening statement the defense counsel stated:

> Members of the jury, there's often a fine line between seduction and allegations of assault, and where that line falls, where it is drawn is what you're going to have to decide in this case.
>
> . . . .
>
> There's also no dispute that this relationship continued and was of a casual nature, as the evidence will show. What that means, and how casual a sexual relationship, will be again the testimony for you to decide, and whether it was on-going or off and on will also play a role in how this case is viewed, and whether or not, on previous occasions during the

---

[6] Although the defense at trial did ask for a "he said/she said" instruction, a "military judge's duty to instruct is not determined by the defense theory; he must instruct if the defense is raised." United States v. Brown, 43 M.J. 187, 189 (C.A.A.F. 1995). The defense's theory of the case is "not dispositive in determining what affirmative defenses have been reasonably raised by the evidence" but can be taken "into account" when "considering [the] evidence." Hibbard, 58 M.J. at 76.

> sexual relationship when a person said "no," . . .
> "no" doesn't always mean "no" in the course of a
> relationship.

During closing argument, the defense counsel returned to this theme:

> And when I hear the government say "No means no, even
> a child understands that," but not if you've been
> saying yes to the child.  If you suddenly say no, that
> doesn't mean that that child understands.  And with
> adults, it's even more complicated, because you have
> someone like [ED] saying yes, yes, yes, no once, yes,
> yes, yes.  And therefore when the government makes the
> argument, "If you say no, that's the end of it," we
> all know that that's not the case and that's an
> oversimplification of all human behavior.

Here DiPaola's defense counsel raises the possibility of a "mixed message" that courts have considered in determining whether a mistake-of-fact instruction should have been given. See United States v. Buckley, 35 M.J. 262, 264 (C.M.A. 1992). While the record clearly reflects that DiPaola wanted to have sex with ED and on the day in question she did not, the pair did not have sexual intercourse that day.  The record also reflects that ED consented to some of the conduct at issue in the specification.  The conduct and conversations of the parties during the encounter, as informed by the "mixed message" defense theme, provide "some evidence" that could support an honest (subjective) and reasonable (objective) belief as to consent to some or all of the alleged acts.

DiPaola's defense counsel also requested a mistake-of-fact instruction regarding DiPaola's belief that he had ED's consent

to act as he did.  The military judge declined to give a mistake-of-fact instruction on this specification, mistakenly believing that such a defense was not available for an indecent assault offense.  While the military judge has a sua sponte duty to give such an instruction even in the absence of a defense request, counsel's request for the instruction is indicative of the defense's theory of the case and can be considered by appellate courts as context for whether the entire record contains "some evidence" that would support the instruction. See Hibbard, 58 M.J. at 73 (stating that the defense theory at trial is a non-dispositive factor).

When "some" evidence exists in the record, the military judge must give a mistake-of-fact instruction.  See United States v. Taylor, 26 M.J. 127, 129-30 (C.M.A. 1988).  Here the record reveals a "mixed message" evidentiary situation which, when considered in conjunction with defense counsel's "mixed message" theme in his opening and closing statements and his request of a mistake-of-fact instruction, comprises "some evidence" of a mistake of fact that the panel could attach credit to if it so desired.  Accordingly, the military judge erred in not instructing the panel on mistake of fact.

> Once it is determined that a specific instruction is
> required but not given, the test for determining
> whether this constitutional error was harmless is
> whether it appears "beyond a reasonable doubt that the
> error complained of did not contribute to the verdict
> obtained."  Chapman v. California, 386 U.S. 18, 24

United States v. DiPaola, No. 08-0200/NA

> (1967).  Stated differently, the test is:  "Is it
> clear beyond a reasonable doubt that a rational jury
> would have found the defendant guilty absent the
> error?"  Neder v. United States, 527 U.S. 1, 18
> (1999).

United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002).

In the context of this case, we cannot say that the absence of a mistake-of-fact instruction on this offense was harmless beyond a reasonable doubt because that instruction resulted in a finding of not guilty when given with respect to another charge involving the same victim in the same setting.  The defense requested and the military judge gave a mistake-of-fact instruction for the indecent exposure offense stemming from DiPaola removing his penis from his pants in ED's presence immediately after the events on the bed occurred.  The mistaken belief at issue in the indecent exposure specification focused on whether ED would find the exposure offensive.  In giving that mistake-of-fact instruction, the military judge instructed the panel to consider the prior relationship and all the circumstances leading to the exposure.  The panel subsequently found DiPaola not guilty of that specification.

Had the military judge given a mistake-of-fact instruction informing the panel to consider the prior relationship and the circumstances leading up to the indecent assault incident, we are unable to find beyond a reasonable doubt that the panel would have found DiPaola guilty.  See Chapman, 386 U.S. at 24.

11

United States v. DiPaola, No. 08-0200/NA

The missing instruction "essentially undercut [a] defense theory and could very well have contributed to the finding of guilty." United States v. Lewis, 65 M.J. 85, 89 (C.A.A.F. 2007).

## Decision

The military judge erred in failing to instruct the panel on the affirmative defense of mistake of fact and that error was not harmless beyond a reasonable doubt.  Accordingly, those portions of the decision of the United States Navy-Marine Corps Court of Criminal Appeals which affirmed Specification 2 of Charge II and the sentence are reversed.  The remaining findings are affirmed.  The finding for Charge II, Specification 2 and the sentence are set aside.  The record is returned to the Judge Advocate General of the Navy for remand to the convening authority for a rehearing on findings on that specification and/or sentencing.

STUCKY, Judge (dissenting):

The majority reaches its conclusion by limiting the evidence it considers and by reducing the mistake of fact defense to a one-dimensional test. The evidence did not reasonably raise a mistake of fact defense as to the indecent assault specification. Therefore, I respectfully dissent.

As noted by the majority, in early 2004, Appellant and Petty Officer ED had a consensual sexual relationship that lasted "a couple of months." On occasion during that relationship, Petty Officer ED had declined to have sex with Appellant, and he had always respected her wishes. She terminated the relationship because she "didn't want to pursue it any further." Thereafter, they had no contact for some time.

On August 12, 2004, Petty Officer ED was sick in quarters. Appellant knocked on her door and, when she answered, said he had been deployed, missed her, and wanted to go out with her. She did not answer, except to say she was sick, and to lie down on her bed. He lay down beside her, and they both fell asleep. When she awoke, Appellant was gone.

On August 15, 2004, Petty Officer ED was still sick in quarters. She went out for food, and upon returning found Appellant standing outside her door. She let him into her room, whereupon he asked her for sex. She said, "no," as she did not feel well and did not want to. He continued his efforts to

convince her to have sex with him by kissing her and touching her breasts. While Petty Officer ED willingly permitted him to do so, she continued to decline his entreaties for sex by saying "no." He removed her shirt and lay on the bed. She "got on top of him" and they continued kissing. But then Appellant "flipped [her] over on [her] back, and then he grabbed [her] wrists and put them above [her] head to hold [her] down." She continued to say that she did not want to have sex with him.

While holding her down, Appellant tried to unzip her pants. She was able to get a hand loose and pulled the zipper back up. He got both of her hands above her head again and, while he was clothed, he started to rub his erect penis over her vaginal area. He squeezed, kissed, and bit her breasts. When she told him not to bite her breasts, he stopped biting them. He rubbed his hand over her clothed crotch, put her legs over his shoulders, and again simulated having sex with her. She kept saying "ouch" because he was hurting her by squeezing her wrists and because of how he had her legs positioned. She kneed him, but was unsuccessful in dislodging him. Appellant was even begging her to have sex with him, even offering her marriage, children, money, and the opportunity to drive his car. That caused them both to laugh.

After Appellant got off Petty Officer ED, he removed his penis from his pants, began stroking it with his hand, and asked

for Petty Officer ED to "suck" it. She kept telling him "no" and told him if he came any closer she would bite off his penis. He laughed at that, put his penis back into his pants, zipped them up, and sat on the bed with her. She put her shirt back on. Appellant then exclaimed that he was amazed at how long it took for her "no" to sink in. Appellant then left the room.

As part of the investigation into Appellant's conduct, the Naval Criminal Investigative Service (NCIS) had Petty Officer ED make a telephone call to Appellant. During the call, Appellant explained his persistence in trying to have sex with Petty Officer ED as "'cause ah, sometime a guy gets desperate and do whatever they have to do to get laid." When she suggested that he usually quits after the first couple of "no's," he stated:

> Nah, I, I don't like giving up on things. I, I, I, I try hard, I work hard on, on, on what I do and and when I want something, I fight for it. So, um, if it takes me a lot of no's to finally realize that it's not happening, then that's what it's going to take.

She then asked if he remembered her saying "ouch" a few times when he held her down. He said he did not. Later, after explaining that he never meant to bruise or hurt her, Appellant said:

> Sometimes when I play, I get a little rough and sometimes girls tell me that I'm getting rough. You might have said ouch, but it might have been more like a seductively [sic] ouch.

> . . . .

3

> There's a lot of types of ouch.  If you would have
> said that actually does hurt, I probably would have
> stopped.

When Appellant was interviewed by NCIS agents, he admitted that, during the forty-five to sixty minutes he was trying to have sex with Petty Officer ED, she told him "no" a lot.  "She was getting frustrated and started to raise her voice at me as she said 'No.'"  Appellant "came to understand that she was not going to change her mind" and have sex with him.

After the parties rested, the defense counsel asked the military judge to give a mistake of fact instruction for the indecent assault specification at issue.  The military judge questioned whether mistake of fact as to consent was a defense, asserting that the only element requiring specific intent was the specific intent to gratify his sexual desires.  The civilian defense counsel conferred with his military colleague and moved on to requesting a mistake of fact instruction as to indecent exposure and some of the lesser included offenses, which the military judge gave.  Neither the parties nor the military judge further discussed the mistake of fact instruction as to the indecent assault offense, and the military judge did not give such an instruction.

An honest and reasonable mistake of fact as to consent is an affirmative defense to indecent assault.  United States v. Peterson, 47 M.J. 231, 234-35 (C.A.A.F. 1997).  The military

4

judge must give a mistake of fact instruction if the issue is reasonably raised by the evidence unless it is affirmatively waived. United States v. Gutierrez, 64 M.J. 374, 375 (C.A.A.F. 2007). To warrant an instruction there must be some evidence that Appellant had "both a subjective belief of consent and a belief that was reasonable under all the circumstances." Peterson, 47 M.J. at 234-35. "It is not necessary that the evidence which raises an issue be compelling or convincing beyond a reasonable doubt. Instead, the instructional duty arises whenever 'some evidence' is presented to which the fact finders might 'attach credit if' they so desire." United States v. Taylor, 26 M.J. 127, 129-30 (C.M.A. 1988) (quoting United States v. Simmelkjaer, 18 C.M.A. 406, 410, 40 C.M.R. 118, 122 (1969)); accord United States v. Hibbard, 58 M.J. 71, 72 (C.A.A.F. 2003). But "a mistake of fact instruction is not warranted where the evidence raises and the parties dispute only the question of actual consent." United States v. Willis, 41 M.J. 435, 438 (C.A.A.F. 1995).

The evidence did not raise mistake of fact as to the specification alleging the indecent assault of Petty Officer ED. Although some evidence of record suggests the reasonable possibility that Petty Officer ED was consenting to Appellant's conduct, there was no evidence that Appellant actually believed the victim was consenting. United States v. Jones, 49 M.J. 85,

91 (C.A.A.F. 1998).  In fact, the evidence demonstrates the contrary -- Appellant honestly believed she was not consenting but thought that if he persisted she might eventually give up and give in.

Appellant relies on (1) statements he made during the pretext telephone call and (2) Petty Officer ED's testimony to establish the need for a mistake of fact instruction.  He points to the following statements he made during the pretext phone call to show the defense of mistake of fact was raised:

(a)  "So, honestly I might not have really even done anything to you that hard to get a bruise on you."

(b)  "I didn't do it in a mean way. . . . I was probably just playing with you.  Sometimes when I play, I get a little rough and sometimes girls tell me that I'm getting rough.  You might have said ouch, but it might have been more like a seductively [sic] ouch."

(c)  "I didn't feel bad at the time, because I really didn't know I left bruises on you . . . ."
These statements are not evidence that Appellant believed Petty Officer ED consented to his advances.  They merely tend to show that he did not intend to cause bruising or to hurt her.

Appellant asserts that Petty Officer ED sent him mixed messages about her willingness to have sex and that permitting him to engage in some sexual acts -- such as removing her shirt,

6

fondling and kissing her breasts -- misled him into believing she would permit him to engage in others.  The majority seems to find this argument persuasive.  I do not.

This was a couple with a sexual history, and the sex had been by mutual consent.  Petty Officer ED would consent to some acts but not others.  When she said "no," he stopped.  Evidence that she willingly participated in some sexual conduct might be sufficient evidence to raise the objective prong of the mistake of fact defense, but there is no evidence "appellant actually or subjectively did infer consent based on these circumstances." Willis, 41 M.J. at 438.

I dissent.