# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
YOB, KRAUSS, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private First Class GEORGE D.B. MACDONALD**
**United States Army, Appellant**

ARMY 20091118

Headquarters, United States Army Maneuver Center of Excellence and Fort Benning
James L. Pohl, Military Judge
Colonel Tracy A. Barnes, Staff Judge Advocate (pretrial)
Lieutenant Colonel Mary M. Foreman, Staff Judge Advocate (post-trial)

For Appellant: Captain Matthew T. Grady, JA (on brief); Captain Brandon H. Iriye (on reply brief); Mr. William E. Cassara (on motion for appellate discovery); Mr. William E. Cassara (argued).

For Appellee: Lieutenant Colonel Amber J. Roach, JA; Major Stephen E. Latino, JA; Captain Catherine L. Brantley, JA (on response to appellant's motion for appellate discovery); Captain Edward J. Whitford, JA (argued).

3 July 2013

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

KRAUSS, Judge:

A panel of officers, sitting as a general court-martial, convicted appellant, contrary to his pleas, of resisting apprehension, premeditated murder, assault consummated by a battery, and assault with a dangerous weapon likely to produce death or grievous bodily harm, in violation of Articles 95, 118, and 128 Uniform Code of Military Justice, 10 U.S.C. §§ 895, 918, and 928 (2006 & Supp. II 2008) [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a reprimand, reduction to the grade of E-1, forfeiture of all pay and allowances, confinement for life without eligibility of parole, and a dishonorable discharge.

Appellant's case is before this court for review under Article 66, UCMJ. Appellant stabbed another soldier to death under rather mysterious circumstances. There was no apparent motive for the killing, Appellant presented, in essence, an insanity defense, claiming that the drug prescribed to him by Army doctors to help him stop smoking, Varenicline (popularly known as and hereinafter referred to as Chantix), contributed to his lack of mental responsibility for the offenses alleged. Appellant assigns eight errors essentially asserting: 1) that the military judge erred by refusing to give the defense requested instruction on involuntary intoxication; 2) that appellant established his lack of mental responsibility at trial; 3) that the military judge erred by quashing a government subpoena issued to Pfizer, Inc. to produce information relative to the drug Chantix[1]; 4) and 5) that the military judge erred in his mental responsibility instructions; 6) that the evidence is legally and factually insufficient to prove premeditated murder; 7) that the military judge erred by allowing certain evidence in aggravation; and 8) that life without eligibility for parole is inappropriately severe. After examining the record of trial, considering the parties' briefs and enjoying oral argument in the case, we find any error harmless as to findings or the sentence.

We discuss here those issues necessary for the proper disposition of the case, namely, the judge's quashing of the subpoena to Pfizer; his failure to instruct on the defense of involuntary intoxication; and the sufficiency of evidence of guilt and appellant's mental responsibility.

## BACKGROUND

*Appellant's Crimes*

Appellant stabbed Private (PVT) Rick Bulmer to death at Fort Benning, Georgia in an otherwise empty barracks bay room to which PVT Bulmer repaired to sleep after being excused from drill and ceremony training. On 18 May 2008, PVT Bulmer had been in basic training for 3 days. Prior to entry into basic training he underwent leg surgery requiring recuperation that prevented his participation in certain training. He was excused from drill and ceremony training that day. His drill sergeant directed Bulmer to wait in the shade next to the barracks. Unobserved by his drill sergeant, PVT Bulmer went into the barracks and into his bed.

Appellant, a nineteen year-old airborne infantry soldier awaiting matriculation with the United States Military Academy Preparatory School (for the class of 2009), was assigned duty with a unit at Fort Benning. On 18 April 2008, an Army doctor at Fort Benning, prescribed appellant Chantix to facilitate his effort to quit smoking. On 18 May 2008, appellant, who resided in the same general barracks complex

---

[1] Appellant also moves this court to order essentially the same discovery from Pfizer.

where PVT Bulmer went to lie down, attacked Private Bulmer with a knife as he slept.

He initiated this attack with a stab to the neck intending to kill the man with one blow.  Instead, the victim, roused from sleep, tried to ward off the attack, ultimately suffering more than fifty knife wounds as appellant tried to finish his victim.

Private Bulmer's screams and pleas for the assault to stop drew the attention of other basic trainees nearby.  Soldiers attending to their own bay then saw, through a window, the assault continuing.  They did not immediately appreciate what was happening.  Two soldiers responded and rushed to the scene still uncertain as to what was happening.  Ultimately they realized one man was attacking another with a knife.  Appellant, at first unaware of the arrival of these two soldiers, continued his brutal assault.

Once appellant recognized the presence of others, he lashed out at one with the knife and pushed him aside while running away from the scene.  Covered in blood, appellant ran to his room, removed his clothes, showered, stuffed his bloody clothes, shoes, and the knife into a backpack, dressed in casual civilian clothes, and took off with his back pack.

In the meantime, an alert was issued and efforts immediately undertaken to find and apprehend the man discovered stabbing PVT Bulmer.  A lone non-commissioned officer (NCO) dispatched to the periphery of Fort Benning, to a training area empty of people at the time, discovered appellant moving along the tree line in a direction away from the scene of the crime.  Challenged, appellant claimed to be going to a particular store on post to buy new sneakers.  Unbelieving, the NCO suspected something amiss and directed appellant to accompany him.  With a common vulgar retort, appellant rebuffed the NCO and made every indication of his intent to continue along, at which point the NCO attempted to apprehend appellant.

Appellant then attempted to flee, requiring the NCO to chase him down and physically subdue and restrain him until military police arrived on the scene and apprehended him themselves.  Several hours later, appellant waived his right to remain silent and admitted the crime, asserting that he intended to kill when he stabbed and that he must have been temporarily insane, describing the idea of murder as coming to him in an ever forceful manner until he felt compelled to kill at that moment.  He acknowledged that what he did was wrong, expressed remorse and disgust with himself for killing, and requested help.  It should also be noted that a day prior to the assault upon PVT Bulmer, appellant telephoned his girlfriend and asked her whether she would still love him if he were to kill someone.

Private Bulmer died from the wounds inflicted by appellant, and appellant was charged with premeditated murder among other offenses. His defense was that Chantix, combined with preexisting mental conditions, drove him to a tragic, psychotic, homicidal assault upon PVT Bulmer and that he was not guilty by reason of lack of mental responsibility.

On 24 September 2008, a sanity board ordered pursuant to Rule for Courts-Martial [hereinafter R.C.M.] 706, concluded that appellant "was able to appreciate the nature and quality or wrongfulness of his conduct" and that he was competent to stand trial. The doctor responsible for that forensic psychiatric evaluation resolved no clinical psychiatric diagnosis of appellant.

*Chantix: Associated Warnings and Side Effects*

The drug Chantix, following Food and Drug Administration (FDA) approval, became the subject of a series of increasingly severe FDA warnings culminating in a so-called "black-box" warning in July 2008. In November 2007, the FDA had issued an "Early Communication About an Ongoing Safety Review of Varenicline" including reference to possible concern over links between the drug and suicidal and aggressive behavior. In February 2008, the FDA issued an "Alert" about Chantix addressing concern of an association between Chantix and serious neuropsychiatric symptoms including "changes in behavior, agitation, depressed mood, suicidal ideation, and attempted and completed suicide." On 16 May 2008, the FDA issued a public health advisory relating updated prescribing information "to include warnings about the possibility of severe changes in mood and behavior in patients taking Chantix." The advisory stated that "Chantix may cause worsening of a current psychiatric illness even if it is currently under control and may cause an old psychiatric illness to reoccur." It also stated that symptoms associated with Chantix "may include anxiety, nervousness, tension, depressed mood, unusual behaviors and thinking about or attempting suicide" and that "[i]n most cases, neuropsychiatric symptoms developed during Chantix treatment, but in others, symptoms developed following withdrawal of varenicline therapy."

The July 2008 "black box" warning for Chantix included:

> All patients being treated with CHANTIX should be observed for neuropsychiatric symptoms including changes in behavior, hostility, agitation, depressed mood, and suicide-related events, including ideation, behavior, and attempted suicide. These symptoms, as well as worsening of pre-existing psychiatric illness and completed suicide have been reported in some patients attempting to quit smoking while taking CHANTIX in the post-marketing experience. . . . Advise patients and

4

> caregivers that the patient should stop taking CHANTIX and contact a healthcare provider immediately if agitation, hostility, depressed mood, or changes in behavior or thinking that are not typical for the patient are observed, or if the patient develops suicidal ideation or suicidal behavior.

Additional warnings were provided along with the "black box" warning that included:

> Serious neuropsychiatric symptoms have been reported in patients being treated with CHANTIX. These post-marketing reports have included changes in mood (including depression and mania), psychosis, hallucinations, paranoia, delusions, homicidal ideation, hostility, agitation, anxiety, and panic, as well as suicidal ideation, suicide attempt, and completed suicide.

Also associated with issuance of the "black box" warning was "Information for Patients" which included:

> Patients should be informed that quitting smoking, with or without CHANTIX, may be associated with nicotine withdrawal symptoms (including depression or agitation) or exacerbation of pre-existing psychiatric illness. Furthermore, some patients have experienced changes in mood (including depression and mania), psychosis, hallucinations, paranoia, delusions, homicidal ideation, aggression, anxiety, and panic, as well as suicidal ideation and suicide when attempting to quit smoking while taking CHANTIX. If patients develop agitation, hostility, depressed mood, or changes in behavior, they should be urged to discontinue CHANTIX and report these symptoms to their healthcare provider immediately.

There was also included "a list of treatment-emergent adverse events reported by patients treated with CHANTIX during all clinical trials" that included: "PSYCHIATRIC DISORDERS. *Frequent:* Anxiety, Depression, Emotional disorder, Irritability, Restlessness. *Infrequent:* Aggression, Agitation, Disorientation, Dissociation, Libido decreased, Mood swings, Thinking abnormal. *Rare:* Bradyphrenia, Euphoric mood, Hallucination, Psychotic disorder, Suicidal ideation."

Finally, included under the heading "Post-Marketing Experience" in the same publication is the following:

> The following adverse events have been reported during post-approval use of CHANTIX[.]sic  Because these events are reported voluntarily from a population of uncertain size, it is not possible to reliably estimate their frequency or establish a causal relationship to drug exposure.  There have been reports of depression, mania, psychosis, hallucinations, paranoia, delusions, homicidal ideation, aggression, hostility, anxiety, and panic, as well as suicidal ideation, suicide attempt, and completed suicide in patients attempting to quit smoking while taking CHANTIX (See Boxed Warning . . .)."  Smoking cessation with or without treatment is associated with nicotine withdrawal symptoms and the exacerbation of underlying psychiatric illness.

Defense Exhibit (DE) I.

Trial defense counsel requested discovery of information relative to Chantix, including the product's a. clinical trial data, b. adverse event reports, c. post-market surveillance, d. stability studies, and e. analytical standards.  Trial counsel issued a subpoena to Pfizer requiring production of the information requested by the defense.  Pfizer expressed a qualified willingness to produce the analytical standards and stability studies but ultimately refused to produce any of the other information despite the subpoena.

Subsequently, defense counsel demanded production of items a-d, above, and requested the military judge enforce the subpoena.  The defense articulated its relevance and necessity to a defense of lack of mental responsibility or diminished capacity.  The judge refused to enforce the subpoena.

The judge declined to enforce the subpoena for essentially four reasons:  1) there was no evidence that Chantix was in appellant's system at the time of the offense (indeed two toxicology blood reports indicated negative presence); 2)  the R.C.M. 706 board made no indication of a mental responsibility issue; 3)  there was no evidence impugning the reliability of the 706 board; and, 4) there was no evidence that Chantix adversely influenced appellant.  The judge concluded, therefore, that, under R.C.M. 703, the defense had failed to establish sufficient relevance and necessity of the requested evidence to enforce the subpoena.

In relation to the third reason given, the judge stated that if that issue were raised "the court will revisit its findings."

After this ruling, the defense succeeded in having a previously collected sample of appellant's urine tested for the presence of Chantix. The urine sample was originally taken (along with a blood sample) when appellant was apprehended. The urine test revealed the presence of Chantix in appellant's system at the time of the offense.

With this information, and in light of the FDA's issuance of a "black box" warning, the defense made a motion for the judge to reconsider his quashing of the subpoena. This time the defense requested the judge order Pfizer to comply with the subpoena and produce only items a-c, above, adding emphasis to post-market surveillance relevant to the "black box" warning. The defense argued for reconsideration of the subpoena request and its enforcement because it had now demonstrated Chantix was in appellant's system, a new and more severe warning about the drug had been issued issued, and the R.C.M. 706 board had never considered the possible influence of Chantix in rendering its conclusions.

The judge concluded that "[i]t doesn't make any difference as far as [he could] see whether [appellant's mental condition was] caused by Chantix or not caused by Chantix. Chantix is an explanation." He went on to deny the motion for reconsideration, stating, "the court does not believe that the new evidence or that anything has changed since its last ruling. The court still believes the proper standard is R.C.M. 703 because this is a court order to a third party, and therefore the defense motion for a reconsideration of its ruling of 24 June is hereby denied."

Additionally, in their request for reconsideration, the defense asserted that all of the adverse event reports relative to Chantix were in the FDA's possession and requested the government produce all of the reports from the FDA. The judge responded, "That strikes me as a discovery issue and we will talk about that."

In a subsequent pretrial session, trial defense counsel again raised its demand stating, "the requested information is what we've litigated before vis-a-vis v. Pfizer, sir, and that is adverse memory reports, clinical trial data, other things that Pfizer- at least the government has placed two documents from Pfizer Pharmaceutical counsel that indicate all of the material is in possession of the Food and Drug Administration." Because the information was in the possession of a federal government agency, the defense demanded the government counsel be directed to produce it. Trial defense counsel went on to state, "The defense is done playing games with Pfizer and everyone else. The FDA has all of the materials that trigger their warnings."

In response, the military judge required trial counsel to ascertain whether the FDA possessed the information and, if so, whether it would produce it declaring that "[i]f the FDA says it will not release . . . without a court order or to the judge for an in camera review I'll do both of those things." The judge reiterated his willingness

7

MACDONALD—ARMY 20091118

to issue a court order to obtain such information from the FDA and directed trial counsel to provide a written status of the matter in eight days.

Later, in another session prior to trial, the defense again raised objection to the judge's refusal to enforce the subpoena issued to Pfizer, obtain the requested information, and review the material in camera to make a determination of relevance. The judge merely acknowledged the objection.

At trial, the defense attacked the qualification, reliability and value of the R.C.M. 706 board in cross-examination of the doctor tasked to complete the forensic psychiatric evaluation.

In its case, the defense introduced all of the FDA/Pfizer warnings associated with Chantix, produced an expert on the subject of drug safety, and two qualified forensic psychiatrists. The drug safety expert opined that Chantix can cause aggression or violent behavior. The two psychiatrists separately and independently diagnosed appellant as suffering from a severe mental disease or defect at the time of the offense and that he did not appreciate the nature, quality, and wrongfulness of his acts. Each diagnosed appellant as suffering preexisting mental conditions, each concluded that appellant suffered a psychotic episode at the time of the killing, and each concluded that the psychotic episode was short-lived. In essence, the defense experts opined that appellant's mental condition experienced an escalation to psychosis, resulting in a psychotic break on the day of the killing, which subsided soon thereafter. The first psychiatrist testified that appellant suffered a Chantix-induced psychosis. The second defense psychiatrist testified that she would not recommend prescription of Chantix to someone such as appellant.

During the government cross-examination of the first defense psychiatrist, defense counsel objected to questions referencing the clinical trials previously requested by defense. The defense counsel made plain his dissatisfaction with the judge's ruling and repeated his assessment that this same information would have been helpful to the defense. The judge curtailed that aspect of the government's cross-examination as a result.

Otherwise, the defense did not renew demand for the production of this information, and neither the judge nor the United States raised the matter of its production again.

In rebuttal, the government produced its own qualified expert psychiatrist (different from the doctor who conducted the R.C.M. 706 board). He offered an opinion in stark contrast to that of the defense experts, concluding instead that appellant was not suffering from a major psychiatric illness at the time of the stabbing, impugning the diagnosis of the defense experts. The government expert asserted that appellant knew the nature of and consequences of his actions and knew

8

right from wrong, and concluded that Chantix did not cause or influence appellant's actions in any way.

Prior to instruction on findings, the defense and the government separately proposed an instruction on the involuntary intoxication defense. Each essentially expressed that if, as a result of side effects from the Chantix prescribed, appellant was unable to appreciate the nature and quality or wrongfulness of his acts, the defense applied as long as knowledge of those side effects could not reasonably be attributed to the appellant. The judge refused to give the proffered defense instruction, concluding that it amounted to a misstatement of the law, stating in essence that it incorrectly substituted intoxication for a severe mental disease or defect as cause of insanity. The judge opted for more standard mental responsibility instructions. The judge made no mention of Chantix in his findings instructions.

During sentencing one of the defense expert psychiatrists testified that appellant "certainly needs to be followed by mental health, psychotherapy, psychiatric care, substance abuse education just because his disorders certainly could be exacerbated by exposure of chemicals into his brain." This expert concluded appellant did not have "the propensity to be a danger in the future" if proper treatment were provided. Similarly, the second defense expert psychiatrist stated appellant "needs a lot of psychotherapy. I think he needs to be followed by mental health people. I think he needs education around substance abuse to make sure he understands that he should not use any kind of drugs or medication that could ever do anything like this again." He concluded that with "proper treatment" appellant would not be a danger to society.

The defense made no request for instruction relative to Chantix for the sentencing phase of the court-martial.

## LAW AND DISCUSSION

The military judge erred by failing to enforce the subpoena, by refusing to provide an involuntary intoxication instruction and by failing to mention Chantix in his instructions on findings. We ultimately deem any such errors harmless.

### Subpoena and Waiver

We review a military judge's decision to quash a subpoena for abuse of discretion. *United States v. Wuterich*, 67 M.J. 63, 77 (C.A.A.F. 2008); *United States v. Reece*, 25 M.J. 93, 95 (C.M.A. 1987). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Graner*, 69 M.J. 104, 107 (C.A.A.F. 2010) (citations

omitted).  Whether a judge abuses his discretion in quashing a subpoena or not, if there is no reasonable probability that the result of trial would have been different but for such error, relief is not warranted.  *See United States v. Morris*, 52 M.J. 193, 197-98 (C.A.A.F. 1999).  *See also United States v. Kelly*, 52 M.J. 773, 776 (Army Ct. Crim. App. 1999) (citations omitted).

The material in Pfizer's and the FDA's possession relative to Chantix was relevant and worthy of discovery.  The threshold of relevance is low.  *See Reece*, 25 M.J. at 95.  *See also* R.C.M. 703(f)(1) ("Each party is entitled to the production of evidence which is relevant and necessary."); Military Rule of Evidence [hereinafter Mil. R. Evid.) 401.  Defense satisfactorily established the relevance of this material to its mental responsibility defense.  Any deference to be rendered the judge's discretion in this case disappears in light of the evidence that appellant had Chantix in his system at the time of the offense and that the FDA issued warnings that Chantix may cause aggressive, hostile behavior and homicidal ideas.  By the time the defense produced expert testimony to the effect that Chantix induced a psychosis preventing appellant from appreciating the nature and quality or wrongfulness of his acts, certainly no reasonable basis existed upon which to deny discovery of that information and enforcement of the subpoena.  There is no doubt the material existed, there is no doubt it included information that informed the FDA warnings, and there is no doubt that the information would further inform the testimony of the defense experts.  It certainly, then, possessed a tendency to establish the fact of appellant's mental responsibility, or lack thereof, as more or less probable than it would have been without the evidence.

The judge's decision was also "influenced by an erroneous view of the law" and was "outside the range of choices reasonably arising from the applicable facts and the law."  *Graner*, 69 M.J. at 107.  The judge effectively denied the existence of an involuntary intoxication defense.  As we discuss below, that is an erroneous view of the law.  We gather from the record that the judge's erroneous failure to recognize the availability and viability of this defense influenced his decision to quash the subpoena.  The judge's declaration that Chantix was merely an explanation for the offense, rather than evidence relevant to a defense of mental responsibility further establishes that his decision to quash was unreasonable, given that an explanation of a mental condition tends to make the existence of that mental condition more or less probable.  Therefore, the judge abused his discretion in quashing the subpoena.  *Graner*, 69 M.J. at 109; *Wuterich*, 67 M.J. at 77-78; *Reece*, 25 M.J. at 95.  *See also* R.C.M. 703(f)(1); Mil. R. Evid. 401.

The specter of waiver is raised by trial defense counsel's failure to renew its demand for production of the Pfizer and/or FDA material despite meeting all of the conditions articulated by the military judge for its relevance prior to trial.   The questions relative to resolution of that issue revolve around whether the judge's denial of the defense's motion to reconsider his decision to quash constituted a

"definitive ruling" sufficient to alleviate defense of the burden to raise the matter anew and whether the defense's apparent assessment was correct that any further effort to require production was futile. *See generally United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F. 2001); *United States v. Holt*, 52 M.J. 173, 185-86 (C.A.A.F. 1999); *United States v. Cardreon*, 52 M.J. 213, 216 (C.A.A.F. 1999). *See also United States v. Andrews*, 44 C.M.R. 219, 222 (C.M.A. 1972); *United States v. Richardson*, 4 C.M.R. 415, 420-21 (A.B.R. 1952).

The matter of potential waiver is unnecessary to the disposition of the issue, however, because, as with the abuse of discretion, there is no reasonable probability that had the evidence been produced, disclosed, and used, the outcome of the proceeding would have been different. Put another way, we would also find any error in quashing the subpoena harmless beyond any reasonable doubt. *See generally United States v. Coleman*, 72 M.J. 184 (C.A.A.F. 2013); *Morris*, 52 M.J. 197-98 (citing, *inter alia*, *United States v. Bagley*, 473 U.S. 667 (1985), *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Eshalomi*, 23 M.J. 12 (C.M.A. 1986)).

The evidence that appellant appreciated the nature, quality and wrongfulness of his acts is sufficiently powerful and overwhelming to establish the reliability of the conviction in this case, and we find that enforcement of the subpoena and discovery of the information in Pfizer's and the FDA's possession would not "create[] a reasonable doubt that did not otherwise exist." *Morris*, 52 M.J. at 198 (citing *Eshalomi*, 23 M.J. at 22).

Appellant admitted that he intended to kill PVT Bulmer; he consciously conceived the thought of taking PVT Bulmer's life and intended the act by which it was taken; he stabbed him in the neck in order to kill him; at the time of this act, he understood his stabbing of PVT Bulmer was wrong; he asked his girlfriend, the day before the murder, whether she would still love him if he killed someone; upon discovery in the act, he lashed out violently against other soldiers in order to escape; immediately after the assault, he ran to his room and undertook efforts to conceal his responsibility for the offense; and, in an effort to perfect his escape, he lied to an NCO and also attempted to flee from apprehension. In light of these facts and the entire record, we find that appellant fully appreciated the nature, quality and wrongfulness of his acts. There is no reasonable probability that anything found in the material sought would raise a reasonable doubt about appellant's mental responsibility for these offenses. *Id.*[2]

Furthermore, we find that the government's expert in rebuttal effectively undermined the credibility of the defense experts' psychiatric diagnoses of appellant

---

[2] We deny appellant's motion for appellate discovery on similar grounds. *See United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002).

and that there is no reasonable probability that enforcement of the subpoena would result in the establishment of any lack of mental responsibility on the part of appellant by clear and convincing evidence. *See* UCMJ art. 50a; *United States v. Martin*, 56 M.J. 97, 110 (C.A.A.F. 2001); *Morris,* 52 M.J. at 198.

Viewing the evidence in the light most favorable to the defense, and in view of the entire record, we find a reasonable possibility that the information in Pfizer's and/or the FDA's possession might establish that Chantix inspired appellant to entertain homicidal ideas and facilitate any tendency toward violent and hostile behavior he otherwise possessed. However, the irresistible impulse defense of insanity was long ago rejected in favor of that now housed in Article 50a. *See United States v. Frederick*, 3 M.J. 230, 236-38 (C.M.A. 1977). Again, based on the entire record, we find no reasonable possibility, let alone probability, that the additional information sought would undermine the finding that despite any effect from Chantix, appellant appreciated the nature, quality and wrongfulness of his acts in stabbing and killing PVT Bulmer.

*Instructions*

Similarly, we find the judge's failure to provide an instruction on the involuntary intoxication defense, and failure to mention Chantix as something for the panel to consider, harmless.

The evidence presented at trial raised the involuntary intoxication defense. The defense of involuntary intoxication is similar to that of lack of mental responsibility in that the defense must prove by clear and convincing evidence that he did not appreciate the nature and quality or wrongfulness of his acts, but different in that he need not prove that he suffered a severe mental disease or defect, but rather that he was intoxicated by some substance that results in what amounts to legal insanity. *See United States v. Hensler*, 44 M.J. 184, 188 (C.A.A.F. 1996); *United States v. Craig*, 3 C.M.R. 304, 311-12 (A.B.R. 1952). Of course, the knowing result of the intoxication in this respect cannot be reasonably attributable to appellant for the defense to apply. *See id.* at 311 (stating the general rule that involuntary intoxication excuses the accused from criminal responsibility when the accused is compelled to drink against his will, or through fraud, stratagem, or by a physician's prescription)

Appellant was prescribed Chantix. Chantix is a drug the FDA warns may inspire homicidal ideas and hostile, violent and aggressive behavior. DE I. Appellant was prescribed Chantix prior to the most severe warnings. A defense expert in forensic psychiatry testified that appellant suffered a Chantix-induced psychosis and that he therefore did not appreciate the nature, quality or wrongfulness of his acts, and the defense provided laboratory evidence that appellant was under the influence of Chantix at the time of the offense. Therefore,

the military judge erred by failing to give an instruction on involuntary intoxication. *See Hensler,* 44 M.J. at 188.  At the very least he should have incorporated mention of Chantix into his instructions as a matter and factor for the panel to consider on the question of mental responsibility and intent.  *See id.*

His refusal to provide the defense instruction was also error.  The proposed instruction was essentially correct, it was not substantially covered in the main instructions, and the failure to give it seriously impaired its effective presentation. *See United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003) (applying this three-part analysis in determining whether failure to give a requested instruction is error). Though the judge's instructions on mental responsibility and intent were correct, the defense of involuntary intoxication, as described above, is sufficiently distinct to warrant a separate instruction.  The judge's failure to provide the instruction was aggravated by his failure to even mention Chantix as relevant to the panel's consideration of the defense of lack of mental responsibility and on the question of intent and seriously impaired the defense presentation.  Just as the military judge may not substitute his assessment of the strength of the defense for that of the panel, he may not undermine the credibility of a defense by refusing to give those instructions necessary to properly define the matters for the panel's consideration. *See United States v. Stanley,* 71 M.J. 60, 62 (C.A.A.F. 2012); R.C.M. 920(e)(3). *See also United States v. Watford¸* 32 M.J. 176, 178 (C.M.A. 1991).

However, despite the error, of course, we must test for prejudice.  Here, for the reasons stated above, we are convinced that these errors were harmless because "[i]s it clear beyond a reasonable doubt that a rational [panel] would have found the defendant guilty absent the error." *See United States v. Baxter*, 72 M.J. 507, 513 (Army Ct. Crim. App. 2013) (citing *United States v. DiPaola*, 67 M.J. 98, 102 (C.A.A.F. 2008)) (internal citations omitted).  Even if the requested instruction were given, it is clear beyond a reasonable doubt that the panel would have found appellant guilty of the offenses charged in this case. *Id.*

Though the particular aspect of the presentation of appellant's defense involving involuntary intoxication was seriously impaired, appellant's presentation of the mental responsibility defense was not impaired.  The ultimate issue to be decided by the panel relative to each is sufficiently equivalent to ensure the reliability of the convictions in this case. *See Hensler*, 44 M.J. at 188.  Appellant cannot escape the overwhelming evidence of his mental responsibility for the offenses he committed. *United States v. Moran*, 65 M.J. 178, 187-88 (C.A.A.F. 2007).

As to whether the judge had a *sua sponte* duty to address involuntary intoxication as it related to the questions of intent and premeditation, we also find that even if such an instruction were rendered, a rational panel would have found appellant guilty of premeditated murder, as well as the other offenses charged, in

light of the overwhelming evidence that appellant was fully able to form the intent necessary to be held criminally liable. *See United States v. Peterson*, 47 M.J. 231, 233-34 (C.A.A.F. 1997) (requiring some evidence the intoxication was of such severity as to render appellant incapable of forming the necessary intent, as opposed to "evidence of mere intoxication"); *Hensler*, 44 M.J. at 187-88. In light of the entire record, we find nothing credible about any indication that Chantix or appellant's mental condition prevented or undermined his ability to form the specific intent necessary for the crimes alleged.

We otherwise find no error with the judge's instructions. Appellant is "entitled to a fair trial, not 'an error–free, perfect trial.'" *United States v. Owens*, 21 M.J. 117, 126 (C.M.A. 1985) (quoting *United States v. Hasting*, 461 U.S. 499, 508 (1983)). We find that the record establishes a fair trial with overwhelming evidence of appellant's guilt. We have considered each of the errors assigned separately and find that none warrant relief and that, assuming error in each case, such error was harmless. We also do not find that "there is a reasonable possibility that, taken cumulatively, those errors might have contributed to the conviction." *United States v. Flores*, 69 M.J. 366, 373 (C.A.A.F. 2011).

In sum, and in short, we also find the evidence legally and factually sufficient to find the appellant guilty of premeditated murder, and the other offenses alleged, and we are not convinced by clear and convincing evidence that he lacked the mental responsibility necessary to be held liable for these crimes. *See generally United States v. Washington,* 57 M.J. 394 (C.A.A.F. 2002).

*Sentencing*

The defense never articulated the relevance of Chantix evidence for the purposes of sentencing, never demanded its production in those terms, never requested sentencing instructions including reference to Chantix, and does not argue that the lack thereof was error before this court. We do, however, find that the Chantix evidence was relevant to consideration of an appropriate sentence. As the judge below acknowledged, it serves as an explanation for the crimes committed, at least in part. By definition, it is a matter in extenuation. R.C.M. 1001(c)(1)(A).

However, here, appellant cannot escape waiver. Nor, under the circumstances, do we find plain error in the judge's failure to address Chantix in his sentencing instructions. *See United States v. Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998). Reasonable tactical considerations exist to justify the defense's decision to refrain from pressing the matter of Chantix at sentencing sufficient to warrant this court's deference and respect for the defense's decisions in the matter. *United States v. Mazza*, 67 M.J. 470, 474-75 (C.A.A.F. 2009)

Ultimately, the evidence as a whole, including the testimony of the defense expert psychiatrists, establishes that appellant is dangerous and susceptible to murderous impulses.  Because of this we find no reasonable probability of a different outcome in sentence had the Pfizer/FDA information sought been produced, and we find the sentence appropriate.  *See generally* UCMJ art. 66(c); *United States v. Healy*, 26 M.J. 394 (C.M.A. 1988); *Eshalomi*, 23 M.J. at 21-28; *United States v. Lanford*, 6 U.S.C.M.A. 371, 20 C.M.R. 87 (1955).

## CONCLUSION

On consideration of the entire record, the parties' briefs, and oral argument, the findings of guilty and the sentence are AFFIRMED.

Senior Judge YOB and Judge BURTON concur.

FOR THE COURT

ANTHONY O. POTTINGER
Chief Deputy Clerk of Court