# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Major DANIEL T. O'CONNOR
### United States Air Force

## ACM 38420

## 12 February 2015

Sentence adjudged 1 March 2013 by GCM convened at Grand Forks Air Force Base, North Dakota. Military Judge: Natalie D. Richardson.

Approved Sentence: Dismissal and a reprimand.

Appellate Counsel for the Appellant: John Wells, Esquire (argued), and Captain Michael A. Schrama.

Appellate Counsel for the United States: Captain Meredith L. Steer (argued); Major Daniel J. Breen; and Gerald R. Bruce, Esquire.

Before

MITCHELL, SANTORO, WEBER
Appellate Military Judges

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under Air Force Rule of Practice and Procedure 18.4.

SANTORO, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his plea, of fraternizing with Staff Sergeant (SSgt) JK by engaging in sexual intercourse with her, in violation of Article 134, UCMJ, 10 U.S.C. § 934. He was found not guilty of engaging in that conduct while she was substantially incapacitated, charged under Article 120, UCMJ, 10 U.S.C. § 920. The adjudged and approved sentence was a dismissal and a reprimand.

Before us, the appellant asserts that (1) the court-martial lacked personal jurisdiction; (2) the Article 32, UCMJ, 10 U.S.C. § 832, investigating officer was improperly tainted by knowledge of the appellant's assertion of his right to counsel;

(3) the delay in docketing the case with this court warrants sentencing relief; (4) the military judge erred in failing to provide a mistake-of-fact instruction; (5) the sentence is inappropriately severe; and (6) the evidence is factually insufficient.

*Background*

In February 2012, approximately 40 Air Force Reserve Airmen traveled in two aircraft to Ramstein Air Base, Germany, to participate in a training mission. The appellant, a reserve flight surgeon, was part of the crew. The mission took them from their home station in Minneapolis, Minnesota, to a refueling stop in Maine, then on to Lajes Field, Portugal, before reaching their final destination. Among those on the appellant's aircraft were Captain (Capt) DS, the mission commander, and SSgt JK and Technical Sergeant (TSgt) JW, both crew members. All wore standard Air Force flight suits during the mission, which included grade insignia on the officers' shoulders and enlisted members' names and ranks on their name tags.

Once the crew disembarked at Lajes Field, they went as a group to the billeting office to check in. There was a significant check-in delay as the desk clerk was assisting the crew from the other aircraft. While they waited, the appellant's crew sat in the waiting area and drank alcoholic beverages they brought from the United States. During the conversation, SSgt JK walked over to the group and, still in her flight suit, introduced herself to the appellant and others and had a conversation with them that lasted approximately 15 minutes.

The officers were billeted in a separate building from the enlisted members. Word had been passed that the officers would be hosting a party and, after everyone had checked in and gone to their rooms, TSgt JW and SSgt JK went to the officers' building to join the party. The officers were wearing robes and slippers they had found in their rooms. Alcohol was freely consumed.

The appellant admitted that he had sexual intercourse with SSgt JK later that night. SSgt JK's testimony diverged with the appellant's, as she claimed that she did not consent to the sexual activity. Both agreed that after the intercourse, the appellant told SSgt JK that she should shave her pubic area.[1]

After the sexual activity, SSgt JK left the appellant's room and found TSgt JW in bed with Captain DS. SSgt JK's testimony differed from TSgt JW's in several respects but both testified that SSgt JK had bruises or "hickeys" on her neck.

---

[1] Staff Sergeant (SSgt) JK testified that the appellant made other offensive comments about her sexual preferences; conversely, the appellant testified that it was SSgt JK who asked him what he was thinking as they lay in bed together after their consensual intercourse. The appellant further testified that he told SSgt JK that she had just cheated on her boyfriend, to which she replied, "Yeah. And you just f[***]ed a staff sergeant."

The crew left Lajes Field the next morning and continued to Ramstein. As they were preparing for a training mission in Germany, another enlisted crewmember, TSgt LR, noticed the bruises on SSgt JK's neck. SSgt JK told TSgt LR what had occurred between her and the appellant. TSgt LR urged SSgt JK to report the incident to her commander, Lieutenant Colonel (Lt Col) LR, which she did. SSgt JK asked Lt Col LR not to make a formal report of the incident. SSgt JK had no interaction with the appellant for the remainder of the mission.

The following month, when the next unit training assembly occurred, SSgt JK was due for a flight physical. The appellant was not the only flight surgeon conducting physicals that day, but he selected SSgt JK's chart and conducted the examination. When the exam was complete, SSgt JK asked the appellant if they could talk about what had happened at Lajes Field. She told him that she felt she had been assaulted and had been attempting to harm herself because she could not get what happened out of her mind. SSgt JK became angry at what she perceived as the appellant's failure to take seriously what happened. She ultimately told him that she wanted to castrate him, shouted an expletive at him, and left the examination room.

Additional facts necessary to resolve the assignments of error are included below.

*Personal Jurisdiction*

In his first assignment of error, the appellant argues that the court-martial lacked personal jurisdiction because he was not properly recalled to active duty. There are three prerequisites that must be met for court-martial jurisdiction to vest: (1) jurisdiction over the offense, (2) personal jurisdiction over the accused, and (3) a properly convened and composed court-martial. *United States v. Harmon*, 63 M.J. 98 (C.A.A.F. 2006); *see also* Rule for Courts-Martial (R.C.M.) 201(b). The appellant specifically challenges personal jurisdiction but conceded the court-martial was properly convened and assumed arguendo that the court-martial had jurisdiction over the offense.

Courts-martial have personal jurisdiction over any person subject to the Uniform Code of Military Justice. Article 2, UCMJ, 10 U.S.C. § 802. "The government may meet its burden of pleading personal jurisdiction by including in the specification a statement of the individual's rank, unit, and armed force." David A. Schlueter, *Military Criminal Justice: Practice and Procedure* § 4-9 at p. 176 (Matthew Bender & Co. 2012). Ordinarily, an accused who wishes to challenge the jurisdiction of the court-martial would move to dismiss the charges under R.C.M. 907(b)(1)(A). In that event, the burden of persuasion is on the Government to show proper jurisdiction by a preponderance of the evidence. R.C.M. 905(c)(2)(B).

"When an accused contests personal jurisdiction on appeal, we review that question of law *de novo*, accepting the military judge's findings of historical facts unless

they are clearly erroneous or unsupported in the record." *United States v. Hart*, 66 M.J. 273, 276 (C.A.A.F. 2008) (quoting *United States v. Melanson*, 53 M.J. 1, 2 (C.A.A.F. 2000)) (internal quotation marks omitted). Although the military judge made no factual findings on this issue because jurisdiction was not challenged at trial, there is no dispute about the events that led to the appellant's recall; rather, the parties dispute the legal conclusion that should flow from those facts.

On 15 January 2013, the Secretary of the Air Force, by memorandum, approved the commander of the United States Air Force Expeditionary Center's (EC/CC) request to recall the appellant to active duty:[2]

> On 12 December 2012, you requested my approval, pursuant to Article 2(d)(5), Uniform Code of Military Justice, to recall [the appellant] to active duty, as needed. You made this request so that a court-martial may adjudge, and [the appellant] may be required to serve a sentence to confinement or restriction on liberty. I hereby approve any recall to active duty of [the appellant] which you have ordered, or may hereafter order.

On 27 January 2013, the EC/CC, by memorandum, ordered the appellant to active duty pending the disposition of the charges against him:

> Pursuant to the Title 10, United States Code, Section 802 and Air Force Instruction 51-201, *Administration of Military Justice*, paragraph 2.9.2 (RCM 202), I order that [the appellant] be extended on active duty pending disposition of charges that were preferred on 8 September 2012. He may be recalled to active duty pending disposition of offenses, or be released to reserve status and be recalled as necessary for court-martial.

Both the Secretary of the Air Force and the EC/CC (the general court-martial convening authority (GCMCA)), cited 10 U.S.C. § 802, which provides that a member of a reserve component may be ordered to active duty involuntarily for the purpose of an Article 32, UCMJ, investigation and trial by court-martial. The statute sets forth several requirements for ordering a reserve member to active duty, such as providing that the Secretary must approve the order in certain situations and must comply with regulations prescribed by the President.

---

[2] Jurisdiction over the appellant's court-martial had been transferred from the 22d Air Force Commander, the Numbered Air Force to which the appellant was assigned, to the Expeditionary Center Commander. This transfer of jurisdiction is not challenged on appeal.

However, on 19 February 2013, an Air Force Form 938, Request and Authorization for Active Duty Training/Active Duty Tour, was generated ordering the appellant to "active duty for special work" for the dates associated with his court-martial. Block 18(a) of those orders incorrectly cited the authority for the tour as 10 U.S.C. § 12301(d). Four amendments to that set of orders were issued, each incorrectly citing as its authority § 12301(d).

We conclude, and appellant does not challenge, that both the Secretary of the Air Force and the GCMCA complied with the requirements of § 802. However, the appellant argues that because his orders to active duty cited § 12301(d) as their authority, we must also look to that section to determine whether the orders were valid. Section 12301(d) provides that "[a]t any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member."

The appellant argues that because his orders cited § 12301(d), a valid recall, and therefore personal jurisdiction, required his consent, which he states was not given.

We previously considered a nearly identical issue in the context of a petition for a writ of mandamus. In *United States v. Toro*, Misc. Dkt. No. 2013-23, Order (A.F. Ct. Crim. App. 2 October 2013), when personal jurisdiction was challenged at trial, the military judge concluded that Toro was properly ordered to active duty pursuant to § 802 despite his orders' reference to § 12301(d) as their authority. We concluded that we were "unwilling to hold that an apparently administrative mistake in one location of a promulgating order carrying out the otherwise clear intent of Air Force officials to properly recall Petitioner" divested the court-martial of jurisdiction. *Toro*, Order at 7.

The appellant's orders differ from Toro's in a key respect: Toro's orders cited *both* § 12301(d) and § 802 as authority, whereas there is no reference whatsoever to § 802 in the appellant's order. There is, however, a reference in the appellant's orders to Air Force Instruction (AFI) 51-201. The first and second amendments to the appellant's recall orders stated: "PER AFI 51-201 FIGURE 6.9 NOTE 1, MEMBER IS NOT ENTITLED TO ANY PER DIEM." That note states: "The [Joint Federal Travel Regulation], volume 1, chapter 7, part O, covers travel of members for disciplinary action. The [temporary duty] orders for members traveling as an Accused must include a statement 'member not entitled to per diem expenses in connection with disciplinary action.'" AFI 51-201, *Administration of Military Justice*, Figure 6.9, Note 1 (21 December 2007, Incorporating Change 1, 3 February 2010).[3] The two subsequent amendments to the appellant's orders neither contained the reference to per diem nor explicitly repudiated it.

---

[3] The current directive is found at Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, Figure 6.8, Note 1 (6 June 2013).

Finally, Block 19 of the appellant's recall orders indicated that the "training category" for which he was called to duty was "LH." Training category LH signifies: "Disciplinary Action Against Member . . . . Identifies individuals who have been called on a tour of [active duty] for the purpose of disciplinary action against the member." AFI 36-2254, Volume I, *Reserve Personnel Participation*, ¶ A2.41 (26 May 2010).[4]

On these facts, we conclude that it was the Air Force's intent to recall the appellant to active duty for his court-martial pursuant to the Secretary's grant of authority and the GCMCA's directive. We further conclude that the reference in the orders to § 12301(d) was an administrative error.

Our superior court has distinguished between jurisdictional and administrative errors and held that administrative errors in the drafting of a convening order are not necessarily fatal and that clerical mistakes may be tested for prejudice. *United States v. Adams*, 66 M.J. 255, 259 (C.A.A.F. 2008). We believe the same test applies here.

The appellant asserts three general forms of prejudice. First, while conceding that he could have been recalled under provisions other than § 12301(d), he impliedly argues that his recall under that section was prejudicial.[5] This argument is unavailing, as we have already determined that he was recalled pursuant to § 802 and that the reference to § 12301(d) was an administrative error.

Second, he argues that the erroneous reference to § 12301(d) was "not a one-time case" and that after our unpublished order in *Toro*, "there has been no attempt to correct the problem." This argument is also unpersuasive. First, the *Toro* order is dated 2 October 2013, nearly eight months *after* the appellant's orders were issued. Second, there is no evidence to support the appellant's contention that there have been no attempts to correct "the problem" of the erroneous statutory citation for recalls for disciplinary purposes. Even if true, we question whether that would rise to the level of prejudice to an individual appellant.

Finally, the appellant asserts that his pay was drawn from funds earmarked for operational or administrative support for local commands, not what he calls a "catch all administrative fund used to pay persons to engage with the military justice system." As the appellant has not asserted that he did not receive the pay and allowances due him, we

---

[4] This AFI superseded Air Force Manual 36-8001, *Reserve Personnel Participation and Training Procedures* (22 January 2004), which was in effect at the time of the appellant's orders and provided the same direction.
[5] At oral argument, appellant's counsel asserted that the proper statutory citation for appellant's recall was 10 U.S.C. § 12301(a), which permits involuntary recall "[i]n time of war or national emergency declared by Congress, or when otherwise authorized by law . . . *for the duration of the war or emergency* and for six months thereafter." (emphasis added). As § 12301(a) would not have authorized the appellant's recall under the circumstances of this case and the appellant concedes that he could have validly been recalled, 10 U.S.C. § 802 remains the only viable means to do so.

discern no prejudice to him resulting from what he contends was a misappropriation of funds.

Assuming arguendo that the reference to § 12301(d) did impose a requirement that the member consent to recall, we next consider whether there is sufficient evidence to establish consent. Despite the appellant's contention on appeal that "he did not *specifically* consent," he points to no evidence in the record of lack of consent. (Emphasis added). We decline to read into § 12301(d) a requirement that for consent to be effective, a member must affirmatively—or "specifically"—consent. In the absence of a statutory requirement for written or other explicit consent, we look to the generally-understood definition of consent: "Agreement, approval, or permission as to some act or purpose." *Black's Law Dictionary* 346 (9th ed. 2009).

We conclude that the absence of a contemporaneous objection by the appellant is some evidence which we may consider in resolving this question. The record establishes that the appellant appeared without apparent objection at his Article 32, UCMJ, investigation. He appeared at trial without apparent objection. He did not challenge the court-martial's jurisdiction over him at trial. He completed and signed his recall orders, which provided that he would receive military pay and allowances for his period of duty. There is no evidence that he rejected or otherwise attempted to return his military pay. Therefore, if the orders' reference to § 12301(d) required the member's consent, we conclude that his consent has been established by a preponderance of the evidence.

### *Sufficiency of the Article 32, UCMJ, Investigation*

The appellant next argues that the Article 32, UCMJ, investigation was improperly tainted when the investigating officer (IO) became aware of the appellant's invocation of his right to counsel during the law enforcement investigation. He did not raise this issue at trial.

R.C.M. 905(b) states that any objection, other than jurisdictional complaints, to the preferral, forwarding, or investigation of a charge must be raised before the plea is entered. R.C.M. 905(e) explains that failing to raise an objection creates waiver on the part of the accused.

Although R.C.M. 905(e) speaks of waiver, because this issue was not raised at trial—rather than discussed and affirmatively waived—we believe it is more appropriately characterized as forfeited absent plain error. *See United States v. Sousa*, 72 M.J. 643, 651–52 (A.F. Ct. Crim. App. 2013).

To prevail under a plain error analysis, the appellant bears the burden of showing that: "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005)

(quoting *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)) (internal quotation marks omitted). Article 32, UCMJ, errors are tested on direct review for prejudice as defined by Article 59(a), UCMJ, 10 U.S.C. § 859(a). *United States v. Davis*, 64 M.J. 445, 449 (C.A.A.F. 2007); *see also United States v. Von Bergen*, 67 M.J. 290, 294 (C.A.A.F. 2009); *United States v. Mickel*, 26 C.M.R. 104, 107 (C.M.A. 1958) ("Once the case comes to trial on the merits, the pretrial proceedings are superseded by the procedures at the trial; the rights accorded to the accused in the pretrial stage merge into his rights at trial.").

The IO's report contained as an attachment an Air Force Office of Special Investigations (AFOSI) Report of Investigation (ROI). The ROI included a statement that the appellant invoked his right to counsel when confronted by AFOSI. This, the appellant contends, violates the privilege rules contained in Mil. R. Evid. 301(f)(3) (invocation of right to counsel during pretrial investigation is inadmissible) and R.C.M. 405(i) (applying Mil. R. Evid. 301 to Article 32, UCMJ, investigations).

Paragraph 2-37 of the ROI explains that the appellant initially waived his Article 31, UCMJ, 10 U.S.C. § 831, rights when AFOSI agents questioned him. He then provided detailed information about the mission to Germany, the arrival at billeting, the layout of the rooms, the departure from Lajes Field, and other details about what occurred once they arrived in Germany. When agents asked him what occurred in his billeting room, the appellant responded by denying any allegation of rape. He thereafter requested counsel, and the questioning ceased.

Although Block 13a of the IO's report indicates that he considered the ROI, the body of his report does not mention the appellant's invocation of his right to counsel or factor that into the analysis of whether reasonable grounds existed to believe that the appellant had committed the alleged offenses or their appropriate disposition.

The Government argues that because AFI 51-201, ¶ 4.1.2.1, requires the IO include as attachments to his report the written evidence that serves as the basis for the charges, and ¶ 4.1.5 states that the IO should review the evidence provided to ascertain what will be necessary to conduct a thorough and impartial investigation, the regulations require that the IO review everything submitted to him. While the Government's assertion is true, it does not directly address the question presented.

Had the IO's report indicated that he did not consider the ROI, or at least the invocation of the right to counsel, we would have no trouble concluding that there was no error. However, he did not do so.

We need not determine whether there was error, however, as we conclude that the IO's failure to state explicitly that he did not consider this evidence, on these facts, did not materially prejudice appellant's substantial rights. Among the factors leading to that

conclusion are: (1) the context of the statement in the ROI was to explain an abrupt end to an ongoing dialog between investigators and the appellant that followed a valid Article 31, UCMJ, rights warning and waiver; (2) the statement was one sentence in a 270-page document; (3) the IO did not reference the invocation of rights in his summary of the evidence; (4) the IO did not reference the invocation of rights in his conclusions and recommendations; (5) the IO was a field-grade judge advocate with legal training; and (6) the IO was serving in a quasi-judicial capacity. *See United States v. Collins*, 6 M.J. 256, 259 (C.M.A. 1979). A judge's becoming aware of a privileged statement during pretrial motion practice does not taint a subsequent bench trial before that same judge sitting as finder of fact. *See United States v. Kawai*, 63 M.J. 591, 597–98 (A.F. Ct. Crim. App. 2006).

Moreover, as the appellant notes, the same ROI was provided to the convening authority prior to his decision to refer the charges to trial. The convening authority may consider information and evidence in addition to that presented during the Article 32, UCMJ, investigation: "The convening authority or judge advocate *may consider information from any source and shall not be limited to the information reviewed by any previous authority*." R.C.M. 601(d)(1) (emphasis added). [6] The privilege rules contained in Mil. R. Evid. 301 do not apply to the convening authority's review of information under R.C.M. 601(d)(1), and thus it was not improper for the convening authority himself to consider the entirety of the ROI. Even assuming this type of information should not be presented to a convening authority, we see no reasonable possibility that the convening authority took any adverse inference toward the appellant because of one brief reference to the appellant's invocation of his right to counsel in a 270-page ROI that was but one of the many exhibits contained in the investigating officer's report.

Finally, the appellant asserts that "military due process" requires relief. Our superior court has rejected that argument. *See United States v. Vazquez*, 72 M.J. 13 (C.A.A.F. 2013). We therefore conclude that the appellant failed to establish that there has been a material prejudice to a substantial right.

*Post-Trial Processing Delay*

The appellant next argues that the 67-day period between the convening authority's action on 21 June 2013 and the case being docketed for our review on 27 August 2013 warrants the "modest relief" of setting aside the dismissal. Under *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), the record should have been docketed with this court within 30 days of the convening authority's action.

---

[6] Rule for Courts-Martial (R.C.M.) 601(d)(2) requires compliance with R.C.M. 405 (pretrial investigation pursuant to Article 32) and preparation of advice by the staff judge advocate. This subsection does not, however, limit the convening authority to consideration of only those matters presented during the pretrial investigation.

We review de novo whether an appellant has been denied the due process right to speedy post-trial review and whether any constitutional error is harmless beyond a reasonable doubt. *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006). The overall delay of 67 days in this case is facially unreasonable and triggers four factors set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Moreno*. *See United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011). Those factors are "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005). *See also Barker*, 507 U.S. at 530. If we are able to conclude directly that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *See Allison*, 63 M.J. at 370.

The appellant does not argue that he has been personally prejudiced by the delay. Instead, he urges us to provide relief "to incentivize adherence to post-trial processing standards." *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration, (2) anxiety and concern, and (3) impairment of ability to present a defense at a rehearing. 63 M.J. at 138–39. None of these concerns are present or alleged in this case. While we agree that *Moreno* violations are unacceptable, we find beyond a reasonable doubt that the appellant was not harmed by the 37-day delay and is thus not entitled to relief under *Moreno*.

While we find the post-trial delay was harmless, that does not end our analysis. Article 66(c), UCMJ, empowers appellate courts to grant sentence relief for excessive post-trial delay without the showing of actual prejudice required by Article 59(a), UCMJ, 10 U.S.C. § 859(a). *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002); *see also United States v. Harvey*, 64 M.J. 13, 24 (C.A.A.F. 2006); *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006) (finding delays were "such that tolerating them would adversely affect the public's perception of the fairness and integrity of the military justice system"). However, "[a]ppellate relief under Article 66(c) should be viewed as the last recourse to vindicate, where appropriate, an appellant's right to timely . . . review." *Tardif*, 57 M.J. at 225.

The Government has provided, in the form of an affidavit penned by an attorney who was not assigned to the base at the relevant times and had no personal knowledge of any of the facts contained in her affidavit, a day-by-day account of the events between the convening authority's action and the forwarding of the record of trial. The Government's position is that there were three overarching reasons for the delay: (1) the base legal office was engaged in a fatal shooting investigation and an on-base forcible rape investigation; (2) the reassignment of the GCMCA's staff judge advocate, deputy staff judge advocate, and chief of military justice, including a five-day period when there were no attorneys present for duty; and (3) the wing legal office's difficulty contacting the appellant's commander, a reserve officer in a geographically separated unit.

To meet the *Moreno* 30-day docketing standard, the record should have been received by Sunday, 21 July 2013. Accepting the Government's affidavit as true, during the 30 days between 21 June 2013 and 17 July 2013, the GCMCA's legal office made only two requests of the wing office, both of an administrative nature and were completed within a day.

The GCMCA's legal office was without attorneys between 15 and 19 July 2013 with no apparent arrangements having been made for coverage. On Thursday, 18 July 2013, one duty day before the 30-day window closed, paralegals from the GCMCA's legal office returned the record of trial (ROT) to the base legal office with "a list of corrections and missing documents," including a missing receipt for the Article 32, UCMJ, investigation and a mislabeled appellate exhibit. The base legal office spent the next 26 days trying to account for the missing, improperly marked, or otherwise incorrect documents.

While we appreciate and understand that significant intervening events may justify delays in post-trial processing, here the first and third of the Government's proffered explanations for the delay centered on events at the base legal office. However, only approximately 36 hours of the initial 28-day period is attributable to actions required of that office. It was only the Thursday before the Sunday deadline that the GCMCA legal office staff advised the base of significant errors in the ROT. Once advised of the issues, it took the base legal office another 26 days—nearly the entire authorized action-to-docketing time period—to correct the deficiencies.

The shooting and rape investigations argued as reasons for delay occurred on 21 July 2013 and 10 August 2013, respectively, so their impact, if any, would relate only to processing delays *after* the *Moreno* standard had already been violated. Additionally, the Government's affidavit makes clear that it was the GCMCA legal office's *paralegals* who identified the deficiencies in the ROT, so the absence of attorneys for the final 5 days of the 30-day window appears not to have been a significant contributing factor.

We recently reminded staff judge advocates of the importance of accurate and timely post-trial processing. In *United States v. Parker*, 73 M.J. 914, 921 (A.F. Ct. Crim. App. 2014), a case involving a defective staff judge advocate's recommendation, we said, "[t]he Government's neglectful post-trial processing . . . created an issue where none should have existed. Under different facts, it might well have led to an order for new post-trial processing or even sentencing relief by this court." Although the lapse in this case predated *Parker*, it occurred 6 years after *Moreno*, 11 years after *Tardif*, and in the face of our continuing to see unnecessary appellate issues created by neglectful post-trial processing.

We conclude that *Tardif* relief is warranted. However, the remedy sought by the appellant—setting aside of the dismissal—would be an undeserved windfall and

unnecessary to send the message to military justice practitioners that we mean what we say about post-trial processing. Had there been elements of the approved sentence other than a reprimand, we may well have exercised our Article 66(c), UCMJ, authority to set them aside. However, we conclude that in the absence of prejudice to the appellant, setting aside the reprimand is an appropriate remedy (and signal) in this case.

*Mistake-of-Fact Instruction*

The appellant also argues for the first time on appeal that the military judge erred in failing to give a mistake-of-fact instruction with respect to whether he was aware that SSgt JK was enlisted.

We review de novo the military judge's instructions to ensure that they correctly address the issues raised by the evidence. *United States v. Maynulet*, 68 M.J. 374 (C.A.A.F. 2010); *United States v. Thomas*, 11 M.J. 315 (C.M.A. 1981). Where, as here, trial defense counsel made no request for the instruction now at issue on appeal, the appellant has forfeited the objection in the absence of plain error. R.C.M. 920(f).[7] If we find error, we must determine whether the error was harmless beyond a reasonable doubt. *United States v. Medina*, 69 M.J. 462 (C.A.A.F. 2011).

The military judge instructed the members that the prosecution had to prove beyond a reasonable doubt that at the time of the conduct at issue, the appellant knew that SSgt JK was enlisted. This is an element of the offense of fraternization and therefore we question whether "mistake of fact as to enlisted status" is an affirmative defense. An affirmative defense is "any special defense which, although not denying that the accused committed the objective acts constituting the offense charged, denies, wholly, or partially, criminal responsibility for those acts." *United States v. Neal*, 68 M.J. 289, 298 (C.A.A.F. 2010) (citing Article 120(t)(16), UCMJ, 10 U.S.C. 920(t)(16)). Here, however, knowledge of the other person's enlisted status is an element of the offense, not an affirmative defense that acknowledges proof of the elements but negates the necessary mens rea for criminal responsibility. In other words, if the appellant was mistaken as to SSgt JK's enlisted status, the elements of the offense would not have been proven, and no affirmative defense would apply.

However, we need not decide that issue because even if a mistake of fact as to enlisted status is an affirmative defense to a charge of fraternization, the military judge was not required to instruct upon it here. R.C.M. 916(j) states:

> [I]t is a defense to an offense that the accused held, as a result
> of ignorance or mistake, an incorrect belief of the true

---

[7] Although we recognize that the rule speaks of "waiver," this is in fact forfeiture. *See United States v. Sousa*, 72 M.J. 643 (A.F. Ct. Crim. App. 2013).

circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. . . . If the ignorance or mistake goes to any . . . element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.

As both the Government and the appellant agree, we assume without deciding that this offense was a general-intent crime, requiring any mistake to be both honest and reasonable.

The prosecution presented ample circumstantial evidence of the appellant's knowledge that SSgt JK was enlisted. Conversely, the appellant himself testified that he did not know SSgt JK was enlisted until she told him post-intercourse. "A military judge is required to instruct members on any affirmative defense that is 'in issue,' and a matter is considered 'in issue' when 'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose.'" *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012) (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)); *see also* R.C.M. 920(e). The "some evidence" may be raised "by evidence presented by the defense, the prosecution, or the court-martial." *United States v. Hibbard*, 58 M.J. 71, 73 (C.A.A.F. 2003) (quoting R.C.M. 916(b), Discussion).

The appellant's testimony, presented "some evidence" of his subjective belief upon which the members could rely if they so chose. However, "'some evidence,' *entitling an accused to an instruction*, has not been presented until 'there exists evidence sufficient for a reasonable jury to find in [the accused's] favor.'" *United States v. Schumacher*, 70 M.J. 387, 389 (C.A.A.F. 2011) (quoting *Mathews v. United States*, 485 U.S. 58, 63, (1988)) (emphasis added). As the mistake-of-fact defense to a general intent crime has both subjective and objective prongs, we turn next to whether there was "some evidence" to support a finding that the appellant's belief was objectively reasonable.

We do not find any evidence upon which the members could rely that the appellant's belief (or, more specifically, lack of knowledge) was objectively reasonable under the facts of this case. *See United States v. Gurney*, 73 M.J. 587, 599 (recon) (A.F. Ct. Crim. App. 2014). The appellant was the senior officer on an aircraft with approximately 20 Air Force personnel. He testified that during the flights, he was engaged in "scanning duties" and "monitoring" what was occurring. All crew members, including SSgt JK, were in standard Air Force flight suits with rank designations. The appellant, SSgt JK, and the remainder of the crew traveled together on flights from Minnesota to Maine and then from Maine to Portugal. Once in Portugal, the appellant and SSgt JK rode together, in uniform, with the rest of the crew to the lodging office.

Still in uniform, the appellant and SSgt JK engaged in conversation at the billeting office while waiting for their room assignments. The officers and enlisted members were billeted in separate buildings. Once at their rooms, the officers began a "robes and slippers" party which SSgt JK and TSgt JW joined after it began. Therefore, we see no evidence that the appellant reasonably believed SSgt JK was not an enlisted member and find no plain error in the military judge's failure to instruct sua sponte on mistake of fact. *See Gurney*, 73 M.J. at 587.

Even assuming error, we find no prejudice resulted from the failure to instruct the members on this matter sua sponte. The appellant argues that *United States v. DiPaola*, 67 M.J. 98 (C.A.A.F. 2008), requires a finding of prejudice. In that case, Petty Officer DiPaola was accused of two specifications of indecent assault and two specifications of indecent exposure under Article 134, UCMJ. The military judge declined to give a mistake-of-fact as to consent instruction with respect to the indecent assault offenses despite evidence that the Court of Appeals for the Armed Forces found would justify such an instruction. In finding that the error was not harmless, our superior court noted, "we cannot say that the absence of a mistake-of-fact instruction . . . was harmless beyond a reasonable doubt because that instruction resulted in a finding of not guilty when given with respect to another charge involving the same victim in the same setting." *Id.* at 102.

Unlike the holding in *DiPaola*, we find no error in the military judge's failure to instruct. In this case, the military judge instructed on mistake of fact as to SSgt JK's consent to the sexual act. The appellant's potential mistake of fact as to SSgt JK's enlisted status, although involving the same person, is qualitatively different than a mistake of fact as to consent. We have considered *DiPaola*'s holding and rationale and nevertheless remain convinced that even if there were instructional error, it was harmless beyond a reasonable doubt.

*Sentence Severity*

This court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006); *United States v. Baier*, 60 M.J. 382, 383–84 (C.A.A.F. 2005). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ. We assess sentence appropriateness by considering the appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial. *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982); *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006), *aff'd*, 65 M.J. 35 (C.A.A.F. 2007).

While we have a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999); *United States v. Healy*,

26 M.J. 394, 395–96 (C.M.A. 1988). The maximum imposable sentence was confinement for two years and a dismissal. The approved sentence of a dismissal and a reprimand was clearly within the discretion of the convening authority.

Fraternization seriously undermines an officer's standing. Among the aggravating factors in this case were that the appellant's misconduct occurred on a military mission and with a fellow crew member for whose medical needs he was responsible. It occurred on a military installation following a party during which other Airmen—all junior to the appellant—observed him drinking and socializing with enlisted members.

There was also evidence from which the members could conclude that the appellant had little rehabilitation potential. He had previously falsified the results of an official Air Force fitness assessment, had initially been denied commissioning due to a "history of incompatible behavior" and, perhaps most importantly, had testified under oath that he did not know SSgt JK was enlisted, testimony which the members clearly rejected as false.

The appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases. *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985). We are not required to engage in comparison of specific cases "except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *Lacy*, 50 M.J. at 288 (quoting *Ballard*, 20 M.J. at 283). The "appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.'" *Id.* If the appellant satisfies his burden, the Government must then establish a rational basis for the disparity. *Id.* Closely-related cases include those which pertain to "coactors involved in a common crime, service members involved in a common or parallel scheme, or some other direct nexus between the service members whose sentences are sought to be compared." *Lacy*, 50 M.J. at 288.

In support of his argument that a closely-related incident occurred, the appellant points to his R.C.M. 1105 clemency submission to the convening authority, which "reference[d] a very similar circumstance" involving a female non-commissioned officer (NCO) and a male officer on the same exercise. The R.C.M. 1105 submission says, "there was an officer from [the appellant's] unit and an NCO from SSgt [JK's] unit in bed together just a few doors down" from the appellant's room.[8] The appellant's submission is silent on what, if any, action was taken as a result. The appellant has failed to meet his burden to show that the cases are closely-related, let alone the disposition of the allegedly closely-related case.

---

[8] We infer from the appellant's argument that he is referring to conduct that occurred between Captain (Capt) DS and Technical Sergeant (TSgt) JW. There is no evidence that whatever occurred between them resulted in self-injurious behavior thereafter, that Capt DS used his rank or position to facilitate future contact with TSgt JW, or that Capt DS had previous integrity lapses.

Accordingly, we hold that a dismissal is not inappropriately severe and reject this assignment of error.

*Factual Sufficiency*

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The elements of the offense were:

(1) that the appellant was a commissioned officer,

(2) that the appellant fraternized on terms of military equality with SSgt JK by engaging in sexual intercourse,

(3) that the appellant then knew that SSgt JK was an enlisted member,

(4) that such fraternization violated the custom of the United States Air Force that officers shall not fraternize with enlisted members on terms of military equality, and

(5) that under the circumstances, the appellant's conduct was prejudicial to good order and discipline in the armed forces.

*See Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 83.b. (2012 ed.).

Before us, the appellant challenges the factual sufficiency only with respect to the final element, arguing that the prosecution failed to introduce any evidence that his conduct was prejudicial to good order and discipline. He argues that the mission continued without incident and that the readiness of the unit was not prejudiced.

The Government argues that prejudice to good order and discipline was established by the following evidence: (1) the conduct occurred on-duty during an overseas training mission, (2) the appellant's conduct resulted in SSgt JK's feeling that she had been raped, (3) the appellant's conduct involved a "vulgar, degrading" comment

to SSgt JK after the act, (4) the appellant's conduct resulted in SSgt JK's engaging in "cutting" behavior, (5) the verbal altercation between the appellant and SSgt JK during a duty-related physical examination, (6) TSgt JW's observation of bruising and concern for SSgt JK, (7) other Airmen's observations of the bruises and discussion of the situation between the appellant and SSgt JK, (8) the appellant's telling other officers about his having had intercourse with a staff sergeant, and (9) the appellant's affirmance of a "What happens in Lajes stays in Lajes" attitude[9] and suggestion to a junior enlisted member that such an attitude was acceptable.

Conduct prejudicial to good order and discipline is conduct which causes a reasonably direct and obvious injury to good order and discipline. Although "[a]lmost any irregular or improper act on the part of a member of the military service could be regarded as prejudicial in some indirect or remote sense," *MCM*, Part IV, ¶ 60.c.(2)(a), only those acts in which the prejudice is reasonably direct and palpable are punishable under Article 134. *Id.*

A low evidentiary threshold is required to satisfy the so-called "terminal element" of an Article 134, UCMJ, offense. *United States v. Goings*, 72 M.J. 202, 206 n.5 (C.A.A.F. 2013); *see also United States v. Phillips*, 70 M.J. 161, 163 (C.A.A.F. 2011) (stating that "evidence that the public was actually aware of the conduct is not necessarily required" to support clause 2 of Article 134, UCMJ's, terminal element); *United States v. Irvin*, 60 M.J. 23, 26 (C.A.A.F. 2004) (finding a sufficient factual basis to support clause 1 and clause 2 of Article 134, UCMJ's, terminal element despite no evidence that any other service members were aware of, or saw, the child pornography).

We have reviewed the record of trial, paying particular attention to the evidence and reasonable inferences that can be drawn therefrom with respect to whether the appellant's conduct was prejudicial to good order and discipline. In viewing the evidence in the light most favorable to the Government, we conclude that a rational factfinder could have found beyond a reasonable doubt that the appellant's conduct met that definition. The appellant, the senior officer present, engaged in sexual intercourse with an enlisted member of his crew while on a mission. Their intercourse left bruises on SSgt JK and became known to other members of the unit during an overseas training mission involving a small group of Air Force members. We also have no difficulty in ourselves concluding beyond a reasonable doubt that the appellant's conduct was prejudicial to good order and discipline. We therefore reject this assignment of error.

*Conclusion*

The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a), 66(c),

---

[9] The appellant testified that he and SSgt JK agreed that, "What happened in Lajes stayed in Lajes."

UCMJ, 10 U.S.C. §§ 859(a), 866(c).  However, we affirm only so much of the sentence as includes a dismissal.  Accordingly, the findings and the sentence, as modified, are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court