# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––––

**No. ACM S32477**

––––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Patrick D. MOORE**
Airman Basic (E-1), U.S. Air Force, *Appellant*

––––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 11 December 2018

––––––––––––––––––––

*Military Judge:* John C. Harwood (arraignment and motions); Donald R. Eller, Jr.

*Approved sentence:* Bad-conduct discharge and confinement for 3 months. Sentence adjudged 24 March 2017 by SpCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Todd M. Swensen, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Dayle P. Percle, USAF; Captain Sean J. Sullivan, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges*.

Judge LEWIS delivered the opinion of the court, in which Senior Judge JOHNSON and Judge DENNIS joined.

––––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

––––––––––––––––––––

LEWIS, Judge:

Appellant, contrary to his pleas, was found guilty by officer members of one specification of drunk driving, one specification of abusive sexual contact

on divers occasions, one specification of assault consummated by a battery,[1] and one specification of drunk and disorderly conduct in violation of Articles 111, 120, 128, and 134 Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 911, 920, 928, 934. The members sentenced Appellant to a bad-conduct discharge and three months of confinement. At action, the convening authority approved the adjudged sentence.

Appellant raises two issues for our consideration on appeal: (1) whether his convictions for abusive sexual contact, drunk driving, and drunk and disorderly conduct are legally and factually sufficient;[2] and (2) whether the military judge erred when he denied Appellant's request for an instruction on mistake of fact as to consent for the abusive sexual contact specification of which he was convicted. We specified an additional issue on whether the military judge erred in instructing that assault consummated by a battery was a lesser-included offense (LIO) of abusive sexual contact in light of *United States v. Armstrong*, 77 M.J. 465 (C.A.A.F. 2018).[3] In addition, we address a facially unreasonable delay in the post-trial processing of Appellant's case.

We resolve the issues of legal and factual sufficiency and instructional error adverse to Appellant. On the specified issue, we find Appellant suffered no material prejudice when the military judge erred in instructing on the LIO of assault consummated by a battery. Finally, we find no relief is warranted for the delay in post-trial processing and affirm the findings and sentence.

## I. BACKGROUND

Appellant's misconduct all involves one common theme: his behavior after consuming alcohol. The offenses span more than two years and began shortly after he arrived at Ramstein Air Base (AB), Germany, in March 2014. Appellant's spouse, also a military member, remained stateside during his assignment to Ramstein AB.

We begin with Appellant's abusive sexual contact of Senior Airman (SrA) WG. On arrival at Ramstein AB, Appellant was assigned to the same squadron as SrA WG. Appellant had no personal relationship with her, and the two

---

[1] Appellant was originally charged with the offense of abusive sexual contact but was acquitted of this offense and instead convicted of assault consummated by a battery.

[2] Appellant does not challenge the legal and factual sufficiency of his assault consummated by a battery conviction.

[3] Appellant's assignment of error brief was filed with this court prior to our superior court's decision in *Armstrong*.

never spent any time alone together. The two would merely speak occasionally and knew many of the same people. While at work, Appellant interacted professionally with SrA WG.

However, while off-duty and after drinking, Appellant would grab SrA WG on her buttocks, without her permission. These incidents would occur after SrA WG would see Appellant and his friends at various clubs near Ramstein AB and greet each of them with a one-arm sideways "church hug," meaning a hug that one would give to greet others at a church service. Appellant would return the hug by placing his hand around her lower back, but then he would slide his hand down and grab her buttocks with one hand. In total, Appellant grabbed SrA WG's buttocks five or more times between April and September 2014. Each time, after being grabbed on the buttocks, SrA WG would say "Don't grab me" or "Don't touch me," and Appellant would take heed and let her go. Appellant did not apologize to SrA WG. When asked about Appellant's response to her verbal rebukes, SrA WG testified: "[Appellant] seemed to just dismiss the issue."

The last time Appellant grabbed SrA WG's buttocks was at a club with 15 to 20 squadron members present. After SrA WG gave Appellant a "church hug," he did not return the hug. When she turned around to talk to someone else, Appellant grabbed her buttocks. SrA WG turned back around and told Appellant, "Don't put your hands on me." Staff Sergeant (SSgt) JB, Appellant's supervisor and a friend of SrA WG, instructed Appellant to not touch SrA WG and to leave her alone. Undeterred, Appellant persisted in asking SrA WG, "You're having sex with the whole [unit]. Why . . . don't you want to have sex with me?" SrA WG began "cussing" at Appellant loudly and members of the unit had to physically restrain both of them to avoid a physical fight. Appellant attempted to apologize later in the evening, but SrA WG did not want to "hear it" and wanted Appellant "out of her face." SrA WG decided not to report Appellant if he never said anything to her and never touched her again. These incidents involving SrA WG surfaced only after Appellant was accused of touching another woman's buttocks, without her consent, 16 months later.

Appellant committed assault consummated by a battery of SR by touching her buttocks with his hand in April 2016. Appellant's actions that same evening also led to the drunk driving charge. Unlike in the incidents involving SrA WG, a casino surveillance camera captured Appellant touching SR's buttocks. SR testified Appellant told her he had "a couple [of] drinks" and was "a little tipsy" even though the casino did not serve alcohol. When SR bent over to retrieve her winnings from a slot machine, Appellant hit her on the buttocks with his hand. SR immediately confronted Appellant, who denied hitting her. As the two argued, Appellant gave his state driver's license to SR to

prove he had given SR his correct name earlier in the argument. Appellant left around 1825 hours, with SR still holding his state driver's license.

About 1930 hours, Appellant called his acting first sergeant, Master Sergeant (MSgt) JS, and asked if he could come to her quarters on Vogelweh Air Station (AS) family housing. Appellant told MSgt JS that he was driving so she gave him directions to her quarters. Appellant sounded "very upbeat, very hyper" on the phone, which struck MSgt JS as odd, as Appellant was typically reserved and not talkative.

Within 10 to 15 seconds of hanging up the phone with Appellant, MSgt JS received a call from security forces about Appellant's behavior at the casino. MSgt JS told security forces that Appellant was driving to her quarters and she was advised to keep him there. MSgt JS hung up with security forces, walked outside, saw Appellant on the sidewalk walking towards her building, and observed Appellant's car parked at the adjacent building. MSgt JS noticed Appellant was wearing the same clothes she had seen him wearing about midnight the day before. When Appellant was two or three feet away, MSgt JS smelled alcohol on him. Appellant asked MSgt JS, "Why do you live in these buildings?" in a very loud voice with a hyper tone. Within 10 minutes, security forces personnel arrived, found the hood to Appellant's car still warm from being recently driven, and took him into custody.

The German Polizei and security forces worked over the next few hours to investigate the incident at the casino and to determine whether Appellant drove drunk. A probable cause blood draw was completed at about 2350 hours. At trial, Dr. ES, a forensic toxicologist from the Armed Forces Medical Examiner System (AFMES), testified that Appellant's sample had a blood alcohol concentration (BAC) of .14. Dr. ES also testified that he was able to perform a retrograde extrapolation to show a potential BAC of .17 to .22 at 2030 hours, about one hour after Appellant stopped driving. Dr. ES could not calculate a BAC prior to this time using retrograde extrapolation.

Finally, Appellant was drunk and disorderly on Ramstein AB in May 2016. At approximately 0200 hours, MC, a female lodging employee, saw Appellant lying down on the grass outside the Kaiserslautern Military Community Center (KMCC). She witnessed Appellant get up, try to open the door to a locked KMCC lodging vehicle, and then attempt to wave down passing cars. Appellant eventually realized MC was watching him so he approached her and told her that he was a lodging guest and needed help finding his room. MC observed Appellant slurring his words a bit. As he got close to MC, Appellant appeared to stumble and grabbed her by the hip. MC backed up and asked for his military identification card so she could check his room number. While walking inside, Appellant asked MC if she wanted to have "unprotected sex with him." She declined his offer. While MC was at the lodging coun-

4

ter, Appellant asked her if she "liked cream pies." MC was offended at what she described as Appellant's "inappropriate", "pretty disgusting", and "sexual" comments at her place of work. MC called security forces to report Appellant's behavior for "the safety of myself and everyone else." The responding security forces member smelled an odor of alcohol coming from Appellant, observed his slurred speech and unsteady walk, and escorted Appellant to his dormitory room.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Importantly, "[t]he term reasonable doubt . . . does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "In applying this test, 'we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution.'" *Id.* (quoting *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001)) (additional citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *Id.* (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A 1993)).

"The test for a factual sufficiency review . . . is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, *the members of the service court are themselves convinced of appellant's guilt beyond a reasonable doubt.*'" *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation omitted); *see also Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). Just as with legal sufficiency, "[t]he term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *Lips*, 22 M.J. at 684).

### 2. Analysis

#### a. Abusive Sexual Contact

Appellant's conviction for abusive sexual contact in this case required the Government to prove three elements beyond a reasonable doubt: (1) that on divers occasions, Appellant committed sexual contact upon SrA WG with the intent to gratify his sexual desires; (2) that Appellant did so by causing bodily harm to SrA WG, by touching her buttocks with his hand; and (3) that Appellant did so without the consent of SrA WG. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(8)(b). In this context, the term "sexual contact" means "any touching . . . either directly or through the clothing, [of] any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." Article 120, UCMJ, 10 U.S.C. § 920(g)(2)(B). "Bodily harm" means "any offensive touching of another, however slight, including any . . . nonconsensual sexual contact." *Id.* § 920(g)(3). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *Id.* § 920(g)(8)(A).

Appellant argues his conviction for abusive sexual contact of SrA WG is legally and factual insufficient for four reasons: (1) SrA WG consented to having her buttocks touched; (2) Appellant had a reasonable mistake of fact that SrA WG consented; (3) the Government failed to prove Appellant had specific intent to gratify his sexual desires; and (4) the Government failed to prove that Appellant's voluntary intoxication did not affect his ability to form specific intent. We address these arguments in turn.

Appellant first posits that SrA WG consented to having her buttocks touched for two reasons: (1) she "repeatedly subjected herself to the situation" where she knew Appellant would touch her buttocks after the hug; and (2) she knew Appellant was drunk and she did not want to be rude. Addressing the first reason, we are not persuaded that SrA WG's decision to give Appellant "church hugs," at any point, demonstrated a freely given agreement to have her buttocks grabbed. SrA WG's consistent and repeated verbal rebukes to Appellant demonstrated her lack of consent. On the second reason, SrA WG's knowledge that Appellant may have been drunk does not impact the strong evidence that she did not consent to his touching. Her decision to not be rude in responding to Appellant's behavior does not, after the fact, transform an unwanted touching into consensual sexual contact.

Appellant's second challenge asserts that he had a reasonable mistake of fact that SrA WG consented. Mistake of fact as to consent means Appellant held, as a result of ignorance or mistake, an incorrect belief that SrA WG consented to having her buttocks grabbed. *See* Rule for Courts-Martial

(R.C.M.) 916(j)(1). This defense has two elements: one subjective and one objective. For the subjective element, the ignorance or mistake must have existed in Appellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult. *See United States v. Brown*, No. ACM 38497, 2015 CCA LEXIS 81, at *6 (A.F. Ct. Crim. App. 3 Mar. 2015) (unpub. op.) (citation omitted). A defense is reasonably raised when "some evidence, without regard to its source or credibility," has been admitted. *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012) (citation omitted).

In our review of the record of trial, we find no evidence that Appellant actually believed SrA WG consented to having her buttocks touched. When SrA WG delivered her rebuke to him each time he touched her buttocks, he simply dismissed her rebuke each time, except the last. That dismissive response, by itself, provides no insight into what he actually believed. Similarly, the fact that Appellant was intoxicated does not provide insight into what he believed. Further, while Appellant touched SrA WG inappropriately multiple times, repeated criminal misconduct does not mean Appellant mistakenly believed his conduct was not criminal. Finally, at the last incident, Appellant's words provide insight into what he actually believed: that SrA WG should have sex with him because he thought she was having sex with others in the unit. That is a far cry from a mistake or ignorance that she consented to be touched. Therefore, we reject the assertion that there was some evidence Appellant actually believed SrA WG consented to be touched on her buttocks. Further, we find any such belief, even if it actually existed, to be unreasonable under the circumstances. No ordinary, prudent, sober adult would believe it is reasonable to grab the buttocks of a co-worker after receiving a "church hug," in public, as a greeting from that co-worker. Further, an ordinary, prudent, sober adult would not repeatedly touch a co-worker inappropriately after being verbally rebuked after each incident.

In his third challenge, Appellant argues there was insufficient evidence that he had specific intent to gratify his sexual desires. We are not persuaded. The repeated and consistent manner in which Appellant grabbed SrA WG's buttocks provides circumstantial evidence of his intent to gratify his sexual desires. Further, after the last incident, Appellant asked SrA WG why she did not want to have sex with him, providing insight into his intent when he grabbed her buttocks. After our review of the evidence presented at trial, we conclude that the Government proved Appellant's intent to gratify his sexual desires beyond a reasonable doubt when he grabbed SrA WG's buttocks on divers occasions.

Appellant's fourth challenge is that the Government failed to prove that Appellant's voluntary intoxication did not affect his ability to form specific

intent. We disagree. The military judge provided the members a voluntary intoxication instruction. *See* R.C.M. 916(l)(2). The instruction properly advised the members that evidence of Appellant's intoxication may either alone, or together with other evidence in the case, cause reasonable doubt about Appellant's specific intent to gratify his sexual desires. *See id.* The instruction also included the caveat that a person may be drunk yet still be aware of his actions and their probable results. SrA WG testified Appellant was intoxicated each time he grabbed her. Having reviewed all the evidence in the record of trial and considering the repeated and consistent nature of Appellant's touchings of SrA WG, we are convinced that Appellant was aware of his actions and their probable results. Appellant's voluntary intoxication did not cause reasonable doubt about his specific intent to gratify his sexual desires.

After considering all of Appellant's challenges and drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence is legally sufficient to support Appellant's conviction for abusive sexual contact on divers occasions. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of abusive sexual contact beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for abusive sexual contact of SrA WG on divers occasions is therefore both legally and factually sufficient.

### b. Drunk Driving

Appellant asserts his drunk driving conviction is legally and factually insufficient because the Government had no direct evidence he was impaired at the time he drove to MSgt JS's quarters. Appellant invites us to review the testimony at trial that he successfully navigated the gate's barriers at Vogelweh AS and the installation's narrow streets and successfully parked his vehicle within the lines near MSgt JS's quarters. Additionally, he notes the gate guards did not stop him for drunk driving, he did not stumble, trip, or fall as he approached MSgt JS, and he successfully descended a flight of stairs. Finally, Appellant notes that his BAC cannot be calculated back to the time period when he was driving.

As the military judge instructed the court members, Appellant's conviction for drunk driving required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant operated a vehicle, to wit: a passenger car; and (2) Appellant operated the vehicle while drunk. *See MCM*, pt. IV, ¶ 35.b. "Drunk" means "any intoxication which is sufficient to impair the rational and full exercise of the mental or physical faculties." *Id.* ¶ 35.c.(6). "Drunk" relates to "intoxication by alcohol." *Id.*

Appellant admitted to SR that he had been drinking and was tipsy while at the casino. In the casino video, he is observed indoors, wearing sunglasses, touching a woman on the buttocks, and then denying it happened. Appellant left the casino with SR still holding his state driver's license. Appellant does not challenge that he drove to MSgt JS's house. He admitted as much when he talked to MSgt JS on the phone a few minutes before he arrived. When he arrived, MSgt JS testified he smelled of alcohol from a distance of two to three feet away, he behaved in a loud and animated way, a notably different manner from his normally reserved personality, and he was wearing the same clothes he had worn the day before. Further, the BAC of .14 at 2350 hours corroborated the testimony of MSgt JS and the admissions of Appellant to SR. Finally, the BAC showed that Appellant consumed alcohol before his apprehension. The Prosecution was not required to prove Appellant had a particular BAC when he drove. We find ample evidence of proof beyond a reasonable doubt that Appellant did not have the rational and full exercise of his mental faculties at the time he drove due to intoxication by alcohol.

While Appellant may have operated and parked his vehicle without incident and walked down a sidewalk and a flight of stairs without falling, we find the evidence legally sufficient to support Appellant's conviction for drunk driving after drawing "every reasonable inference from the evidence of record in favor of the prosecution". *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of drunk driving beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for drunk driving is therefore both legally and factually sufficient.

### c. Drunk and Disorderly Conduct

For his behavior in and around KMCC lodging, Appellant raises multiple challenges: (1) a lack of evidence that his mental or physical faculties were so impaired that he could not act like a normal, rational person; (2) MC was not "freaked out;" (3) MC deals with drunk people at her job; (4) MC often gets "hit on" at her job; (5) MC's opinion of the Air Force was not lowered so his behavior cannot be service discrediting; and (6) if he had committed the offense, security forces would have apprehended him. We address his arguments as we discuss how the Prosecution proved the elements of this offense beyond a reasonable doubt.

The Prosecution needed to prove beyond a reasonable doubt two elements: (1) Appellant was drunk and disorderly; and (2) his conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 73.b. The term "drunk" has the same definition as the drunk driving offense discussed above. *See id.* ¶ 73.c.(1). "Disorderly conduct" is "conduct of such a nature as to affect

the peace and quiet of persons who may witness it and who may be disturbed or provoked to resentment thereby." *Id.* ¶ 73.c.(2). "It includes conduct that endangers public morals or outrages public decency and any disturbance of a contentious or turbulent character." *Id.* "Conduct of a nature to bring discredit upon the armed forces" is "conduct which has a tendency to bring the service into disrepute or which tends to lower it in public esteem." *Id.* ¶ 60.c.(3).

Multiple witnesses testified to their observations of Appellant, which were consistent with him being drunk. The responding security forces member smelled an odor of alcohol coming from Appellant and observed slurred speech and an unsteady walk. MC confirmed Appellant's slurred speech and observed Appellant behave in a way that showed he was not rationally and fully exercising his mental faculties. Most prominently, Appellant decided to lay in the grass outside lodging, alone, in the middle of the night, and then tried to enter a locked KMCC lodging van.

Similarly, Appellant's behavior was disorderly. He attempted to enter the KMCC van without permission, then stumbled into MC and grabbed her hip, and then continued to use inappropriate sexual language to inquire about her sexual preferences after she declined his earlier sexual advance. Appellant's behavior at MC's workplace made her uncomfortable enough to call security forces for the first time in the two years she worked at lodging. Despite Appellant's assertion that MC was not "freaked out," MC maintained on cross-examination that she was a "little freaked out" by Appellant's continued presence in the lobby. It does not matter that MC endured the behavior of other drunk individuals as part of her job or had been propositioned in the past while working at KMCC lodging when we conduct our assessment of legal and factual sufficiency. What matters is that the Prosecution proved beyond a reasonable doubt that Appellant's actions qualified as a disturbance of a contentious and turbulent character.

The Prosecution also proved Appellant's behavior was of a nature to bring discredit upon the armed forces. Military law does not require that the public know of Appellant's conduct. *United States v. Phillips*, 70 M.J. 161, 165–66 (C.A.A.F. 2011). Instead, the focus is on the nature of the conduct and whether it would tend to bring discredit on the armed forces, if known by the public. *Id.* The responsibility for evaluation of the nature of the conduct rested with the trier of fact. *Id.* at 166. While MC, an on-base lodging employee, did not think any less of the military because of Appellant's actions, the Prosecution did not need to prove that MC's opinion of the military was lowered. We conclude Appellant's conduct was service discrediting as the reputation of the armed forces would tend to be lowered if the public knew the totality of Appellant's conduct that night at KMCC lodging.

Finally, while it is undisputed that the security forces member chose to escort Appellant to his dormitory rather than apprehend him, that decision did not foreclose preferral, referral, and trial on the merits for this offense. We find the evidence is legally sufficient to support Appellant's conviction for drunk and disorderly conduct beyond a reasonable doubt after drawing "every reasonable inference from the evidence of record in favor of the prosecution." *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of drunk and disorderly conduct. *See Turner*, 25 M.J. at 325. Appellant's conviction is therefore both legally and factually sufficient.

## B. Mistake of Fact as to Consent Instruction

### 1. Additional Background

The military judge declined to give a defense-requested instruction on mistake of fact as to consent for the offense of grabbing SrA WG's buttocks on divers occasions. Trial defense counsel argued the defense was raised by some evidence as SrA WG "continued to initiate hugs" and this "would indicate to him that she's okay . . . having bodily contact with him. It at least presents an issue of confusion in his mind . . . ." The Prosecution objected to the instruction and argued the evidence did not reasonably raise the defense.

### 2. Law

The adequacy of a military judge's instructions is reviewed de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). "The military judge bears the primary responsibility for ensuring that mandatory instructions . . . are given and given accurately." *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003); *see also* R.C.M. 920(a). A military judge must instruct the members concerning a defense if the record contains "some evidence on each of [the] elements . . . ." *United States v. Jenkins*, 59 M.J. 893, 898 (A. Ct. Crim. App. 2004) (quoting *United States v. Ferguson*, 15 M.J. 12, 17 (C.M.A. 1983)) (additional citation omitted). A defense is reasonably raised when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." *Stanley*, 71 M.J. at 61 (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)); *United States v. Watford*, 32 M.J. 176, 178 (C.M.A. 1991) (noting a defense is reasonably raised when there is "some evidence" to which the panel members "might attach credence" (quoting *United States v. Taylor*, 26 M.J. 127, 129–30 (C.M.A. 1988)). "Any doubt whether an instruction should be given should be resolved in favor of the accused." *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000) (citing *United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A. 1981)).

An accused is not required to testify in order to establish a mistake of fact defense. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998). The evidence to support a mistake of fact instruction can come from evidence presented by the defense, the prosecution, or the court-martial. *Id.* (citation omitted). "The defense theory at trial and the nature of the evidence presented by the defense are factors that may be considered in determining whether the accused is entitled to a mistake of fact instruction . . . ." *United States v. Hibbard*, 58 M.J. 71, 73 (C.A.A.F. 2003) (citations omitted). A mistake of fact instruction "is not warranted where the evidence raises and the parties dispute only the question of actual consent." *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citations omitted). In "mixed message" cases, a prior consensual sexual relationship or consent to some of the conduct charged in the specification provides some evidence that could support an honest (subjective) and reasonable (objective) belief as to consent. *United States v. DiPaola*, 67 M.J. 98, 101–02 (C.A.A.F. 2008).

### 3. Discussion

Conducting our de novo review, we agree that the military judge properly determined there was not "some" evidence to raise the reasonable mistake of fact defense. On the objective prong, the military judge concluded that it would not be "reasonable, under the circumstances and the evidence presented . . . [as SrA WG] made repeated objections in voicing her displeasure to [Appellant]." We agree. On the subjective prong, the military judge concluded "there's no evidence . . . [Appellant] honestly believed that [SrA WG consented]. . . . There has to be some evidence to reflect [Appellant's] mindset." We agree, as there was not "some" evidence presented that Appellant was mistaken, ignorant, or confused in his mind any time after he received a "church hug" from SrA WG. The evidence was that Appellant was dismissive of SrA WG's rebukes delivered immediately after he committed the offense, save the last time. The last time, he was anything but dismissive of SrA WG's rebuke. Appellant instead accused SrA WG of "having sex with the whole [unit]" and asked why she would not have sex with him. His words certainly do not show that Appellant was laboring under a mistake or ignorance that SrA WG consented the last time he grabbed her buttocks. Similarly, we do not find his prior behavior of dismissing SrA WG's rebukes to be some evidence that he actually held a mistaken belief, or was ignorant, that she consented to his behavior.

The military judge distinguished Appellant's case from the "mixed message" cases where the mistake of fact as to consent defense is raised due to prior consensual sexual contact between the two individuals. *See DiPaola*, 67 M.J. at 101–02. The military judge noted that Appellant and SrA WG were not in a relationship where the touching of the buttocks was an agreed to ac-

tivity and that SrA WG expressed some displeasure each time her buttocks were touched. The military judge declined to find the type of hug Appellant received from SrA WG, described as "her hand is around his shoulder," to implicate the "mixed message" line of cases. We decline to find that a "church hug" of the kind SrA WG initiated, in public, provided any "mixed message" to Appellant that caused him to believe she consented to being touched on her buttocks.

The military judge also addressed whether the testimony that Appellant dismissed SrA WG's rebukes because he was intoxicated reasonably raised the defense of mistake of fact as to consent:

> The court wrestles with the idea of how intoxication may reflect on [Appellant's] honest belief that she was consenting if in fact he didn't get the rejections. And so, on one hand, it might show that he . . . thought she was amenable to it, because he was so drunk he didn't get the message or he was so drunk that he thought anybody who gave him a hug would be amenable to having their buttocks grabbed.

The military judge concluded "[i]n either case, there's no evidence before the court that [Appellant] had [an] honest belief." We agree with the military judge's ultimate conclusion. We decline to find Appellant's dismissive responses to SrA WG, which may or may not be related to his intoxication, to be some evidence of Appellant's honest belief that SrA WG was consenting. We also note that Appellant's first dismissive response only occurred after the first time he completed the offense of abusive sexual contact of SrA WG. Further, he did not have a dismissive response the last time the offense occurred.

## C. Lesser-Included Offense

### 1. Additional Background

This court specified the issue of whether the military judge erred in his instruction that assault consummated by a battery was an LIO in Appellant's case in light of the recent decision by the United States Court of Appeals for the Armed Forces (CAAF) in *United States v. Armstrong*, 77 M.J. 465 (C.A.A.F. 2018). Additionally, we asked counsel to brief whether Appellant waived or forfeited the issue and, if Appellant forfeited the issue, whether there was plain error.

The specification at issue charged Appellant with abusive sexual contact by causing bodily harm of SR.[4] The language of the specification generally

---

[4] Charge II, Specification 1, alleged:

*(Footnote continues on next page)*

tracks the model specification, but adds the words "without her consent." *See MCM*, pt. IV, ¶ 45.f.(7)(b).

At an Article 39(a), UCMJ, session during the Government's case-in-chief, the parties began discussing findings instructions. The military judge initially indicated his reluctance to discuss instructions before the parties rested but summarized a prior R.C.M. 802 conference as "[b]oth sides are in agreement that nothing was likely to change from a factual standpoint so they were both content talking instructions." The military judge further summarized, "I think both sides are in agreement that the [LIO] of assault consummated by battery was applicable" to all abusive sexual contact specifications. The parties also discussed the applicability of the defense of reasonable mistake of fact to assault consummated by a battery. Trial defense counsel did not object when the military judge instructed the members that assault consummated by a battery was an LIO of abusive sexual contact.

### 2. Law

Whether an offense is an LIO is a question of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 54 (C.A.A.F. 2011) (citation omitted). Article 79, UCMJ, authorizes a court-martial to find the accused "guilty of an offense necessarily included in the offense charged . . . ." 10 U.S.C. § 879. The "elements test" determines whether an offense is "necessarily included in the offense charged." *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010). An offense is an LIO of the charged offense if each of its elements is necessarily also an element of the charged offense. *United States v. Wilkins*, 71 M.J. 410, 412 (C.A.A.F. 2012) (citation omitted). Looking at just the elements in the statutory definitions of the two offenses, "assault consummated by a battery is not necessarily included in abusive sexual contact by causing bodily harm." *Armstrong*, 77 M.J. at 472.

Even if the elements "are not necessarily a subset of the elements of the charged offense, the charging language may ensure that the offense is 'necessarily included in the offense charged' within the meaning of Article 79, UCMJ." *Id.* (citations omitted). The definition of bodily harm, under Article 120(g)(3), UCMJ, only provides notice that the Government would attempt to prove an offensive touching; it does not provide notice that the Government

---

[Appellant], did, at or near Kaiserslautern, Germany, on or about 10 April 2016, commit sexual contact upon [SR], to wit: touching her buttocks with his hand, with the intent to gratify his sexual desires, by causing bodily harm to her, to wit: touching her buttocks with his hand without her consent.

would have to prove "unlawful force or violence" as required under Article 128(a), UCMJ. *See id.* To establish assault consummated by a battery of SR, the Prosecution needed to prove beyond a reasonable doubt two elements: (1) Appellant did bodily harm to SR by touching her buttocks with his hand; and (2) the bodily harm was done with unlawful force or violence. *See MCM*, pt. IV, ¶ 54.b.(2). The military judge instructed the members:

> A "battery" is an unlawful and intentional application of force or violence to another. The act must be done without legal justification or excuse and without the lawful consent of the victim. "Bodily harm" means any physical injury to or offensive touching of another person, however slight. "Unlawful" means there is no legal justification or excuse.

"Whether an accused has waived an issue is a question of law we review de novo." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citation omitted). "The rights at issue when determining whether one offense is a [LIO] of another are constitutional in nature, as '[t]he due process principle of fair notice mandates that an accused has a right to know what offense and under what legal theory he will be convicted.'" *United States v. Oliver*, 76 M.J. 271, 273 (C.A.A.F. 2017) (second alteration in original) (quoting *Jones*, 68 M.J. at 468) (internal quotation marks omitted). There is a presumption against the waiver of constitutional rights. *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008) (citation omitted). Appellant may waive the right to raise a constitutional issue on appeal provided it is "clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id.* (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)).

In cases of forfeiture, we review for plain error where Appellant has the burden of demonstrating: "(1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted). Under this standard, even if there was an error, no relief is warranted unless Appellant can show the second and third requirements. *United States v. Robinson*, 77 M.J. 294, 299 (C.A.A.F. 2018) (citation omitted).

### 3. Analysis

We determine that assault consummated by a battery is not an LIO of abusive sexual contact as charged in Appellant's case; that Appellant forfeited the issue; and that no relief is warranted as Appellant suffered no material prejudice to his substantial rights because Appellant knew he was defending against the LIO of assault consummated by a battery.

On appeal, the Government concedes that post-*Armstrong*, assault consummated by a battery is not an LIO of abusive sexual contact, by causing

bodily harm, under the elements test. However, the Government asserts that when the additional language "without her consent" was added to the specification, that provided sufficient notice of necessary facts and elements for Appellant to defend against the LIO of assault consummated by a battery. We are not persuaded. The words "without her consent" simply restate the part of the definition of "bodily harm" that uses the word "nonconsensual." We decline to find the words "without her consent" to be the functional equivalent to the element of "unlawful force or violence" under Article 128(a), UCMJ.

The Government also asserts that Appellant waived the issue of the erroneous instruction. We disagree. The preliminary discussion of instructions and LIOs took place in an R.C.M 802 conference, which the military judge summarized on the record. The record does not make clear how the discussion of LIOs among the trial counsel, trial defense counsel, and military judge began as it was only summarized. We acknowledge trial defense counsel: (1) did not object to the military judge's summary of the R.C.M. 802 conference as it related to LIOs; (2) fully participated in the Article 39(a), UCMJ, session where instructions, the findings worksheet, and the LIO and its possible defenses were thoroughly reviewed; and (3) did not object when the oral or written instructions were given to the members. We do note the *MCM*, Appendix 12A, lists assault consummated by a battery as an LIO of abusive sexual contact as non-binding guidance to practitioners. *MCM*, App. 21, at A12A–1, A12A–4.[5] The CAAF did not decide *Armstrong* until 15 months after Appellant's trial concluded. Under these circumstances, the Government has failed to rebut the presumption against the waiver of constitutional rights and has not shown that Appellant intentionally relinquished or abandoned a known right. Given these circumstances, we find that Appellant forfeited rather than waived the issue at trial and accordingly conduct a plain error analysis.

Our superior court has found similar errors regarding what is an LIO to be clear or obvious errors, so we immediately turn our attention to whether Appellant suffered material prejudice. *See, e.g., Armstrong*, 77 M.J. at 473; *United States v. Tunstall*, 72 M.J. 191, 195 (C.A.A.F. 2013). In cases involving incorrect instructions regarding LIOs, prejudice can be caused by not having "notice as to the offense that must be defended against." *United States v. Miller*, 67 M.J. 385, 388 (C.A.A.F. 2009) (citation omitted). Appellant's counsel

---

[5] When the *Military Justice Act of 2016* takes effect, a court-martial will be authorized to find the accused guilty of an offense that is necessarily included in the offense charged and "any lesser included offense so designated by regulation prescribed by the President." *Armstrong*, 77 M.J. at 469 n.3 (citing *National Defense Authorization Act for Fiscal Year 2017,* Pub. L. No. 114–328, § 5402, 130 Stat. 2000, 2937 (2016)).

argues that Appellant was prejudiced as he was not on notice he had to defend against the unlawful force or violence element under Article 128(a), UCMJ. Further, Appellant argues that his case is distinguishable from *Armstrong*, where the defense requested instructions before the presentation of evidence, because Appellant was not on notice until after the Government had finished its findings case. The Government argues that Appellant knew he was defending against the LIO because from the time of opening statements his counsel argued the case was "overcharged."

Addressing the Government's argument first, we will not draw the inference the Defense knew it was defending against the LIO of assault consummated by a battery when trial defense counsel characterized the case as "overcharged" in opening statement. The Defense's theme in opening focused on the case being "overcharged" in the four specifications and "unsupported" by the evidence. Trial defense counsel did mention in opening the expected testimony of SR and elected to play the casino video of the incident for the members. However, trial defense counsel did not mention any LIOs or use the term "unlawful force or violence." We find an insufficient basis in the record to conclude that Appellant knew at the time of opening statement he was defending against assault consummated by a battery.

We reject Appellant's assertion that he did not know until "after the Government had finished its findings case." The record of trial unequivocally shows that instructions were discussed, at length, before the Government rested their case-in-chief. During this same Article 39(a), UCMJ, session, the parties agreed they were working on a findings worksheet that would contain the option of a conviction for assault consummated by a battery. Additionally, the record contains a thorough discussion on the applicability of reasonable mistake of fact as to consent as a defense to assault consummated by a battery.

SR was still subject to recall for further cross-examination when Appellant most definitively knew he was defending against assault consummated by a battery. Not surprisingly, trial defense counsel did not request such an opportunity, as they had the evidence they needed from the cross-examination they had already conducted and the casino video. The video made it extremely difficult to challenge that Appellant did not touch SR's buttocks with his hand. Instead, the Defense first focused on Appellant's intent, which was successful as the members acquitted Appellant of abusive sexual contact of SR. However, the Defense also attempted to raise reasonable doubt as to whether SR consented and whether the touching was nothing more than his attempt to move SR out of the way so he could sit down. While both approaches ultimately failed, the Defense not only knew they were defending against assault consummated by a battery, but the trial defense team

fully and capably defended against it. The Defense at one point even told the military judge they might request a special instruction about normal contact in a crowded elevator being "implied consent for the unlawful element of the lesser included." We conclude that Appellant knew he was defending against the LIO prior to the Government resting its case-in-chief and thus suffered no material prejudice. We acknowledge that in *Armstrong* the issue of instructions came up prior to the presentation of any evidence. 77 M.J. at 473. But in *Armstrong*, trial defense counsel stated there were no LIOs. *Id.* Here, Appellant, prior to the close of the Government's case-in-chief, fully embraced that assault consummated by a battery was an LIO. Under the circumstances of this case, Appellant suffered no material prejudice from the instructional error.

## D. Post-Trial Delay

### 1. Additional Background

Appellant's court-martial concluded on 24 March 2017. On 13 July 2017, the convening authority took action on the case in a timely manner, 111 days after Appellant's trial. By this time, Appellant had already served his term of confinement. On 17 August 2017, the case was docketed with this court, 35 days after convening authority action. The record contains no explanation for the five-day delay in docketing Appellant's case.

### 2. Law

In *United States v. Moreno*, the CAAF established a presumption of a facially unreasonable delay when the record of trial is not docketed with the service court of criminal appeals within 30 days of the convening authority's action. 63 M.J. 129, 142 (C.A.A.F. 2006). Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

In *Moreno*, the CAAF identified three types of cognizable prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Where, as in this case, the appellant does not prevail on the substantive grounds of his appeal, there is

no oppressive incarceration. *Id.* at 139 (citation omitted). Similarly, where an appellant's substantive appeal fails, his ability to present a defense at a re-hearing is not impaired. *Id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate deci-sion." *Id.*

### 3. Analysis

In this case, Appellant has not requested relief under *Moreno* so there is no assertion that the post-trial delay amounted to a denial of his due process rights. Similarly, there is no assertion of any particularized anxiety or con-cern during the delay between convening authority action and docketing with this court—a period during which Appellant was not confined.

As we find no prejudice and assess the remaining *Barker* factors as not so egregious as to undermine confidence in the fairness and integrity of the mili-tary justice system, we find no violation of Appellant's due process rights un-der *Moreno*. Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–25 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that such an exercise of our authority is not appropriate in this case.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court